429 P.2d 677

Charles A. MYERS and Evelyn M. Myers, husband and wife, Appellants,

v.

Robert C. ROLLETTE, Appellee.

I CA–CIV 261.

Court of Appeals of Arizona.

June 29, 1967.

Rehearing Denied July 31, 1967.

Review Granted Oct. 3, 1967.

Elsing & Crable, by W. T. Elsing and F. R. Crable, Phoenix, for appellants.

Carson, Messinger, Elliott, Laughlin & Ragan, by Richard H. Elliott and Robert W. Holland, Phoenix, for appellee.

STEVENS, Judge.

Robert C. Rollette filed an action in the Superior Court seeking damages from Mr. and Mrs. Charles A. Myers. The Rollette claim was based upon personal injuries he sustained while he was an employee in a hazardous occupation. The plaintiff urged the applicability of Arizona's Employers' Liability Law, A.R.S. Section 23-801 to Section 23-808. A judgment was entered in favor of Rollette and Mr. and Mrs. Myers appealed. Since the matter of the Rollette-Myers relationship was one concerning which Mrs. Myers had little personal first-hand knowledge, we will hereinafter refer to Mr. Myers as Myers or as the defendant.

In his answer Myers denied that the occupation was hazardous. His opening state-

ment to the jury admitted that it was a hazardous occupation and no issue arises in connection with this appeal to controvert that at the time of his injury, Rollette was engaged in a hazardous occupation. Myers' main defenses were: that Rollette was a partner and not an employee; that Rollette's conduct was negligent, his negligence being the sole proximate cause of his injuries; and that when Myers suggested that he (Myers) secure insurance, Rollette advised him against doing so stating that he (Rollette) was insured and that in reliance thereon Myers did not secure insurance thereby placing Rollette in the position that he was estopped to urge his claim. The matter of Rollette's negligence was the subject of proper instructions and this issue was resolved by the jury against Myers.

The court instructed the jury that as a matter of law Rollette was an employee. This is urged to have been error as is the trial court's refusal to give a defendant's instruction which would have permitted the jury to decide the fact of the nature of the Rollette-Myers relationship.

The trial court sustained the Rollette position that the defense of estoppel was not available to Myers. In so ruling, the trial court refused to permit this portion of the answer to be read to the jury and after the defendant's offer of proof, rejected the offer. These actions are urged to have been error.

Myers also urges error in several of the facets of the issue of damages.

Rollette was injured on 22 March 1961 at which time he was 41 years of age. The trial commenced on 12 April 1965 resulting in a jury verdict of $130,000. The motion for new trial was denied upon condition that a remittitur be filed in the sum of $50,625. The remittitur was filed and the judgment before us for review was entered in the sum of $79,375.

While still a youth, Rollette became an active operator of machinery. He became an expert heavy equipment operator. During his World War II overseas assignment with the Sea Bees, he operated various types of heavy equipment. After his discharge from the service he owned and drove trucks in an interstate operation. He also became, and at the time of the trial he was, in conjunction with his brothers, a part-owner of a Wisconsin business known as the Strasberg Lumber and Fuel Company, hereinafter called Strasberg. At the time of the trial he was also a part-owner and the principal operator of the Leisure Lawn Product Company, hereinafter called Leisure Lawn. The product produced by Leisure Lawn was an artificially colored fine rock used in residential yards in place of the conventional grass lawn.

In late 1960, Rollette left his Wisconsin home in a Strasberg owned automobile coming West to secure outdoor employment. Prior to this time he had known Myers and had worked for him. When Rollette reached Phoenix he contacted Myers who at the time was interested in acquiring an unpatented mining claim containing granite in place. Myers' plan was to blast the granite free from its native state, crush it into salable gravel and market the product. Rollette was experienced in all phases of this type of operation. The early Rollette-Myers conversations were to the effect that they would acquire the mining claim together with the necessary machinery and operate the venture all on a 50-50 basis. There was a time interval between the first conversations and the final arrangements. Rollette successfully urged that the final arrangements created an employer-employee relationship with Rollette being the employee. Myers urged in the trial court and urges here, that at most that evidence disclosed a disputed question of fact and that the trial court erred when the issue was resolved in favor of Rollette as a matter of law without submitting the issue to the jury for its determination.

## THE RELATIONSHIP

■■ The relationship between the parties was resolved as an instructed verdict against the defendant and we agree with him

that we must view this phase of the case most strongly in favor of his position. Casey v. Beaudry Motor Company, 83 Ariz. 6, 315 P.2d 662 (1957); Campbell v. Brinson, 89 Ariz. 197, 360 P.2d 211 (1961). On the other hand, if the evidence is of that quality that reasonable men could not differ as to its interpretation, then the action of the trial court was correct. *Casey*; Stearman v. Miranda, 97 Ariz. 55, 396 P.2d 622 (1964). There is no dispute in relation to some of the facts:

Rollette and Myers jointly inspected the unpatented mining claim. Rollette drew the agreement of purchase. Myers was the purchaser, Rollette signing as a witness. Myers paid the down-payment and assumed the obligation for the balance of the purchase price.

The same general procedure was followed in connection with the initial purchase of machinery. Both men were active in the rehabilitation of the machinery and in the early phases of the operation of the property. Myers paid for all necessary replacement parts. At times Rollette purchased parts from his own resources and, for these purchases, he was reimbursed by Myers.

It was contemplated that after the venture became operative Myers would be absent for periods of time with Rollette in charge of the production of gravel. Myers was to have the responsibility of marketing the gravel.

While Rollette was in the hospital following the injury, Myers, without consulting Rollette, decided to shut down the operation. Certain payments were made by Myers to Rollette and, in order to enable Rollette to prepare his income tax returns, Myers issued the required W-2 income tax forms which were consistent with the employer-employee relationship and inconsistent with a partnership relationship. No partnership income tax returns were filed. Myers paid out of his funds any wages which were paid to workmen other than Rollette and these were few in number. Myers' personal funds were the source of

his payment to Rollette. There was no partnership bank account and Rollette had no authority to write checks on Myers' account. Myers did not maintain a business account separate from his own personal account. Myers stated that had there been profits from the operation, the profits would have been his and that any losses were to be borne by him. These facts are not disputed.

Rollette testified that Myers employed him after the abandonment of the 50-50 tentative agreement, the employment being on the basis of $110 a week plus 10¢ a ton for the granite crushed and sold. Rollette calculated that on this basis, by working long hours, he could earn up to $18,000 a year.

Myers testified that after the 50-50 plan had been abandoned and before work commenced at the unpatented mining claim:

"A I think I told Mr. Rollette that as long as I had bought the equipment, that I would just as soon own it; that instead of working 50-50, I would give him a working interest in it. He could work it by the ton and until repair work was done, I would give him $110 a week.

 &ast; &ast; &ast; &ast; &ast; &ast;

"A I considered him as working partner.

"Q A working partner? That's just like a partnership, for instance, we might have in the practice of law; is that right? Regular partnership?

"A I would imagine so.

 &ast; &ast; &ast; &ast; &ast; &ast;

"Q Well, didn't you tell me that you were not really his employer but that he was actually your partner?

"A That's what I considered him."

Where the rights of third parties are not involved, the matter of presence or absence of a partnership depends upon the facts and circumstances of each individual case and the intention of the parties. Tripp

v. Chubb, 69 Ariz. 31, 208 P.2d 312 (1949); Nichols v. Elkins, 2 Ariz.App. 272, 408 P.2d 34 (1965). Payment for services rendered may be on a piece work or per ton basis without creating a partnership. A.R.S. Section 29-207(4) (b); S. A. Gerrard Company v. Cannon, 43 Ariz. 14, 28 P.2d 1016 (1934).

█ We agree with the trial court that in the face of the record reasonable men could not differ and that the evidence established an employer-employee relationship.

### ESTOPPEL

Paragraph 9 of the answer to the complaint alleged in substance that, prior to the commencement of work, Myers undertook to secure Workmen's Compensation and that he was informed by Rollette that this was not needed as he (Rollette) already carried insurance against loss by accident. Myers alleged that he relied on this statement by Rollette and, therefore, did not secure Workmen's Compensation coverage. Myers based his defense of estoppel upon these allegations. The trial court ruled that this paragraph of the answer could not be read to the jury.

After the close of the plaintiff's case and prior to the presentation of evidence on behalf of the defendant, an offer of proof was made relative to this issue. Myers testified in support of the offer of proof and his testimony is summarized as follows:

A week or two after work started, Myers called his insurance agent and "I asked if he could furnish compensation, business compensation—I believe it would be Industrial Insurance. He said 'No'. I would have to secure it from the Industrial Commission." This conversation was related to Rollette who stated, "Don't get any insurance for me. I have my own." The matter was not discussed further. Myers did not seek coverage under the Arizona Workmen's Compensation Act. In response to the question as to why he had not secured Workmen's Compensation Insurance, he stated "Well, I suppose (sic)

if he had his own, it wouldn't be necessary". Myers did not make inquiry of Rollette as to the nature of his insurance. He was asked "Did you inquire as to whether he meant Industrial Compensation insurance?", to which he responded "I didn't ask. That's what I supposed". We agree with the ruling of the trial court for several reasons.

█ It appeared from the hospital admission data that Rollette claimed some coverage through Strasberg. This may have been the insurance to which he referred. The fact that Rollette had accident insurance of his own which would pay benefits to him in the event of injury would not be admissible to reduce or eliminate Rollette's recovery. This principle is normally referred to as the collateral source rule. Cases which illustrate this rule are: Lashin v. Corcoran, 146 Conn. 512, 152 A.2d 639 (1959); Bailey v. Jeffries-Eaves, Inc., 76 N.M. 278, 414 P.2d 503 (1966) and Siebrand v. Gossnell, 234 F.2d 81 (9th Cir.1956).

█ In the event that Myers had secured insurance to protect him from loss imposed by the Employers' Liability Law, that fact would not have been admissible in evidence on the part of the plaintiff. It would not have been proper for the plaintiff to show that a defendant in a tort action was insured. Consolidated Motors, Inc. v. Ketcham, 49 Ariz. 295, 66 P.2d 246 (1937); Muehlebach v. Mercer Mortuary And Chapel, Inc., 93 Ariz. 60, 378 P.2d 741 (1963). The converse is also true.

A.R.S. Section 23-807, a portion of the Employers' Liability Law, declares Arizona's public policy as follows:

"A. Any contract, rule, regulation or device whatever, the purpose or intent of which is to enable an employer to exempt himself from any liability created by this article, is to that extent void.

"B. In an action brought under this article the employer may set off any amount he has contributed or paid for

any insurance, relief, benefit or indemnity, or had paid to the injured employee or his personal representative on account of the injury or death for which the action is brought."

In our opinion, the plea of estoppel is an effort to contravene this statute. Had Myers secured Workmen's Compensation coverage Rollette had the option to elect or reject the coverage. Section 8, Article 18, Arizona Constitution, 1 A.R.S.

 The three essential elements of estoppel are set forth in Holmes v. Graves, 83 Ariz. 174, 318 P.2d 354 (1957). These are:

"First, acts inconsistent with the claim afterwards relied on; second, action by the adverse party on the faith of such conduct; third, injury to the adverse party resulting from the repudiation of such conduct."

In our opinion the facts in this case do not sustain an estoppel and we find no error in the rulings of the trial judge.

## DAMAGES

There are a number of important aspects of this general subject. The evidence disclosed that after the cast was removed and while Rollette was on crutches he fell and reinjured his left leg. A new cast was applied. After the second cast had been removed, Rollette returned to Myers' employment on the basis of 15¢ per ton of gravel crushed and sold. After that venture terminated, Rollette engaged in strenuous physical activity and at the time of the trial it was disclosed that in his work with Leisure Lawn he was engaging in the limited operation of a small mechanical machine. Although the doctors testified that Rollette made a remarkable recovery, the evidence disclosed that he had permanent residuals including the shortening of his left leg, the weakening of the muscles of this left leg and a boney spur growth in the left ankle which was both painful and progressive. There was evidence of a reduction in Rollette's physical capacities by virtue of these personal injuries.

We will first consider the defendant's assertion that the plaintiff's recovery is limited by the Workmen's Compensation Act. In this connection the defendant cites the case of The Arizona Cotton Oil Company v. Thompson, 30 Ariz. 204, 245 P. 673 (1926). The Arizona Constitution in section 7 of Article 18 provides for the enactment of an Employers' Liability Law and this constitutional authority was implemented in early statehood. The Constitution also then contained, and now contains, Section 6 of Article 18 which states:

"The right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation."

Section 31 of Article 2 states:

"No law shall be enacted in this State limiting the amount of damages to be recovered for causing the death or injury of any person."

In 1925, the Arizona Constitution was amended by adding Section 8 of Article 18. This section was approved by the Arizona Legislature and referred to the people where an affirmative vote was cast. This section authorized the enactment of a Workmen's Compensation Law. In the same legislative session which approved the proposed constitutional amendment, the Legislature also adopted a Workmen's Compensation Law, the same to become effective upon the approval by the people of the constitutional amendment. The Workmen's Compensation Law now appears as A.R.S. Sections 23–901 to 23–1087. Both hazardous and non-hazardous occupations may be covered by the Workmen's Compensation Law. A.R.S. Section 23–1030, a portion of the Workmen's Compensation Law, is as follows:

"This chapter shall not be construed as having repealed the sections of the

**50**

statutes commonly known as the employer's liability law."

▮▮▮▮ Prior to the decision in Thompson, the Arizona Supreme Court considered the Employers' Liability Law and in Ocana v. Ray Consolidated Copper Company, 22 Ariz. 112, 194 P. 959 (1921), held that pain and suffering are a proper element for consideration in awarding damages. The matter of pain and suffering is not an element for consideration in a Workmen's Compensation Award. An injury in the nature sustained by Rollette would be a scheduled injury under A.R.S. Section 23–1044, subsec. B. In a Workmen's Compensation matter there would be an award for temporary, total disability followed by a final award for permanent, partial disability. The defendant urges that in the Rollette situation the permanent, partial disability award would be in the neighborhood of $2,968.75. We come then to the consideration of Thompson which was relied on by the defendant. There is language in that decision which states that with the adoption of the Workmen's Compensation Act there came into being a limitation upon the recovery under the Employers' Liability Law and that the Employers' Liability Law recovery must bear a reasonable relationship to the amount which would be awarded under the Workmen's Compensation Act. In Thompson, the court made allowance for medical and hospital bills and attorney's fees. We are reluctant to find ourselves in affirmative disagreement with our Supreme Court. It is our opinion that the limitation which Thompson places on recoveries under the Employers' Liability Law cannot be sustained. We respectfully decline to follow Thompson.

▮▮▮▮ The next area of urged error arises out of the use of a chart in suggesting the amount of damages to be awarded for indeterminate factors such as pain and suffering, physical impairment and like items. Defendant urges that this use was improper and cites Botta v. Brunner, 26 N.J. 82, 138 A.2d 713, 60 A.L.R.2d 1331 (1958). It is our opinion that the use of charts in argument was within the sound discretion of the trial judge. We are impressed by the reasoning in Newbury v. Vogel, 151 Colo. 520, 379 P.2d 811 (1963); Vanlandingham v. Gartman, 236 Ark. 504, 367 S.W.2d 111 (1963); and O'Rielly Motor Company v. Rich, 3 Ariz.App. 21, 411 P.2d 194 (1966).

▮▮▮▮ During the argument there was no objection to the plaintiff's use of the charts. During the argument on behalf of the defense, counsel referred to the figures set forth in the charts in an effort to show their inaccuracy. The error, if any, was not of that magnitude which could not be cured by an admonition of the court. The error, if any, was waived. Young Candy & Tobacco Company v. Montoya, 91 Ariz. 363, 372 P.2d 703 (1962); and Beliak v. Plants, 93 Ariz. 266, 379 P.2d 976 (1963). For these reasons we do not agree with the defendant's claim of error in this respect.

▮▮▮▮ The next phase of damages relates to future medical expenses. In outlining the elements of damage the court instructed in part that the jury could take into consideration " * * * doctor bills, hospital bills and medical expenses for future medical treatment, if you find from a preponderance of the evidence that such expenses may reasonably be incurred in the future, and if you find that the plaintiff's injuries are continuing or permanent in their nature * * * ". This language was contained in plaintiff's requested instruction number 3. Portions of this requested instruction were the subject of objections and exceptions but the portion above quoted was not objected to. This constitutes a waiver. Salinas v. Kahn, 2 Ariz.App. 181, 407 P.2d 120 (1965).

During the course of the argument the plaintiff urged the reasonable probability of future surgery within five years and the disabling effect of surgery thereafter. There was medical evidence concerning the progressive nature of the spurs in the left ankle and the probability that the ankle

would have to be either fused or immobilized by a brace. During the course of the argument there was no objection to the five year estimate and this was not raised in the motion for new trial. It was first raised in connection with the appeal. Plaintiff's counsel was surprised to learn that there was no evidence relative to an estimate of five years.

■ The evidence did not sustain an instruction on future surgery and this phase of the evidence and instructions were urged on the motion for new trial notwithstanding the failure to object at the time the instruction was given. The trial court apparently concluded that notwithstanding the lack of objections the jury could have well been influenced in its verdict by this phase of the presentation on argument. Apparently the trial court gave consideration to the figures set forth on the chart in the matter of computing the sum specified in the remittitur. Under all these circumstances we find no error in relation to the consideration of future medical expenses.

■ The defendant urges that the verdict was a result of passion and prejudice which could not be cured by a remittitur. We agree that if a verdict is a result of passion and prejudice a remittitur will not cure the resulting verdict. Stallcup v. Rathbun, 76 Ariz. 63, 258 P.2d 821 (1953). See also McClain v. Sinclair, 2 Ariz.App. 543, 410 P.2d 500 (1966). The basic test is whether the verdict shocks the conscience and sensibility of the court. Standard Oil Company of California v. Shields, 58 Ariz. 239, 119 P.2d 116 (1941). Apparently the trial court was not so impressed. From our examination of the record we hold the same opinion. We cannot agree with the defendant that, based upon ordinary personal injury standards, the final judgment was excessive even though neither side has presented a case which sustains a judgment in this dollar amount for like injuries.

■ The defendant urges an absence of adequate evidence to sustain a recovery for past wages lost or for future loss of earning power. The plaintiff alleged that prior to the injury he was able bodied, skilled in operation of heavy machinery and capable of earning in excess of $15,000 a year. These allegations were admitted in the answer. Possibly greater detail in connection with the matter of past and future loss of earning power could have been developed. It is our opinion that the evidence is adequate in the area of pain and suffering and permanent disability to support the judgment.

■ The defendant urges that the verdict is excessive, asserting that the overall verdict was disproportionately large to the established special damages. The defendant urges that the record discloses that he paid a $340.40 hospital bill and a $175.00 doctor bill. He further urges that at most the record reveals the following special damages which could be considered by the jury: Travel, $380.00; Medical, $210.00; Loss Of Wages, $7380.00; or a total of $7,970.00. He then asserts that this sum is less than one-half of one percent of the verdict. In our opinion each case must be considered on its own facts. Even should we agree with the defendant's analysis of the record, we are not willing to establish a rule of thumb relationship between special damages and the overall recovery. We do not agree with this aspect of the defendant's appeal.

■ Before the leg had been completely healed, and while the plaintiff was on crutches, he fell and reinjured the leg. This issue was set forth in the defendant's answer and was the subject of evidence. This issue was adequately covered by the instructions and the arguments to the jury.

We have not attempted to answer every question raised by the appeal. It is our opinion from a study of the overall record that the judgment should be affirmed and we so direct.

CAMERON, C. J., and DONOFRIO, J., concur.