477 P.2d 540

**ST. GREGORY'S CHURCH, the Most Reverend Francis J. Green, Bishop of the Roman Catholic Church of the Diocese of Tucson, a Corporation Sole, Appellant,**

v.

**Thomas P. O'CONNOR and Nora Lucille O'Connor, husband and wife, Appellees.**

**No. I CA–CIV I120.**

Court of Appeals of Arizona,
Division 1,
Department A.

Dec. 9, 1970.

Rehearing Denied Jan. 6, 1971.

Review Denied Feb. 16, 1971.

Jennings, Strouss & Salmon, by William R. Jones, Jr., and M. Byron Lewis, Phoenix, for appellant.

Evans & Kunz, Ltd., by Donald R. Kunz, Phoenix, for appellees.

STEVENS, Judge.

In this opinion we will refer to Mrs. Nora Lucille O'Connor as the plaintiff. Mr. Thomas P. O'Connor, who is since deceased, and who was her husband, will be referred to as Mr. O'Connor. The defendant in the trial court was The Most Reverend Francis J. Green, Bishop of the Roman Catholic Church of the Diocese of Tucson, a corporation sole, the owner of St. Gregory's Church in Phoenix. The incident which is the basis of the claim for relief occurred on church property on 28 December 1963 at which time the plaintiff was 57 years of age and Mr. O'Connor was 61 years of age. The trial to a jury was conducted in December 1968. The jury returned a verdict in the sum of $80,000. The trial court ordered a remittitur to the sum of $60,000 which was accepted by the plaintiffs and a judgment in that sum was entered. The motion for new trial was denied and this appeal followed.

On the day in question the plaintiff and Mr. O'Connor were in the process of walking from the public sidewalk up a walkway on church property when the plaintiff tripped over a step in the walkway and fell, sustaining the injuries which are the subject of this action. The O'Connors were in route to the sanctuary to attend the wedding of the daughter of a friend. The day was bright and sunny. The accident occurred shortly before noon.

The plaintiffs alleged that:

" * * * it was the duty of the defendant and his agents to exercise all due and ordinary care and caution for the safety of plaintiffs while on said premises, but said defendant negligently failed and refused to perform said duty with respect to the walkway into the Sanctuary facing 18th Avenue, due to faulty or defective construction, creating a dangerous condition under the circumstances, of which said defendant knew or should have known, and which said defendant negligently failed to remedy, * * *."

In the second Count of their complaint the plaintiffs further alleged:

" * * * the said dangerous condition was dangerous to the health and safety of strangers to said property and the public, and was in truth and in fact both a public and a private nuisance."

These allegations were placed in issue.

The pretrial statement signed by counsel for the parties admitted the fact of the accident. The statement listed as one of the contested issues:

"The parties agree that the contested issues of fact and law in this case involve whether or not the defendant was negligent and the plaintiff contributorily negligent."

The walkway in question led from the public sidewalk to the main entrance of the sanctuary wherein the wedding services were to be performed. Although the various measurements were established with great accuracy, we state them in this opinion in approximate figures. The distance from the public sidewalk to the entrance of the sanctuary was 52 feet. The elevation of the sanctuary was two feet higher than the public sidewalk. The walkway from the public sidewalk to the sanctuary entrance was 19 feet in width. Forty feet from the public sidewalk there was a step which extended across the full width of the walkway and which was 5 inches in height. The walkway from the public sidewalk to the step was banked by shrubs which, from the pictures in evidence, this Court would estimate to be possibly 2 to 3 feet high. That portion of the walkway between the step and the church entrance, approximately 12 feet, was banked by a brick structure. The top of the brick structure was slightly lower than the top of the adjoining hedge. The entire walkway was uniform in color and other than the step itself there were no signs or other

indications as to the presence of the step. If a person's view was unobstructed as that person proceeded up the walkway to the sanctuary the step was open and obvious.

On the day in question two weddings were conducted in the sanctuary in the forenoon. The wedding which the O'Connors were to attend was the second of the two. As they approached the sanctuary there were a number of people on the walkway, some leaving the first wedding ceremony and some arriving for the second. Some people were moving away from the sanctuary. Others were standing in groups apparently visiting and waiting for the first wedding couple to leave the church. The O'Connors had never been to St. Gregory's and were not aware of the existence of the step. They approached the sanctuary together, closely following the people who were preceding them. The O'Connors did not see the step. The plaintiff tripped over the step and fractured the right femur at the neck of the femur just below the ball and socket joint. The doctor referred to the injury as an intracapsular fracture. There was bone displacement, that is the bone did not remain in alignment.

Surgery was performed the following day and Hagge pins were inserted to hold the broken bone in place during the healing process. This was followed by a period when it was necessary for the plaintiff to use a wheel chair and then crutches.

The plaintiff sustained pain and a later X ray disclosed:

"* * * one pin extending about a quarter of an inch into the hip joint."

The pins were removed by a surgical procedure in October 1964. There then appeared to be a good bone union. However, shortly thereafter without additional trauma, the femur again fractured at the December 1963 fracture site.

In November 1964 the plaintiff submitted to a third surgical procedure. At this time a stainless steel hip prosthesis was inserted. The prosthesis had:

"* * * approximately a six inch stem on it which slides into the upper portion of the femur * * *."

Again there was a period of recovery. The doctor testified:

"A. Let me understand that question again—has she suffered any permanent disability as a result of that fracture?

"Q. Yes.

"A. With respect to her other normal activities?

"Q. Yes, this is what I was getting at.

"A. I would think she probably has not suffered any permanent disability as a result of that as compared to her other normal activities.

"Q. All right, sir, as a result of the surgical procedures which have been carried out on Mrs. O'Connor, Dr. Fife, is she going to require some medical attention in the future?

"A. Yes, she may.

\* \* \* \* \* \*

"A. It is very difficult to estimate exactly what medical attention she will require as the result of her operations on her hip, because her attention is going to be for the whole person, and the hip will only be one part of the items of her body that will require attention:

But I think it would be safe to say that she may require symptomatic pain medication and medication because of pain in the hip."

At the trial the plaintiff testified as to her limitations of activity and the fact that she tired very easily when walking. The plaintiff had an arthritic condition which was under reasonable control with medication.

Prior to the trial the O'Connors could no longer operate their guest facility near Apache Junction. Although they had given thought to selling prior to the accident, the plaintiff's condition hastened the sale. They then moved to Phoenix. Mr. O'Connor sustained a coronary in October 1968 prior to the trial in December 1968.

The basic contentions urged by the defendant on this appeal are five in number. We state them as follows:

1. Was it error to deny a motion for mistrial and to deny the motion for new trial based upon the inability of the defendant to adequately cross-examine Mr. O'Connor?

2. Was the verdict excessive as the result of passion and prejudice which was not cured by remittitur?

3. Was it error to permit an architect to testify that it was not good practice to construct the walkway in the manner in which it was constructed, that is to say by placing a step therein?

4. Was it error to deny the defendant the privilege of presenting evidence as to the absence of accidents?

5. Was there reversible error in the instructions?

### CROSS-EXAMINATION

The trial consumed four trial days. These were not consecutive days. There was a recess after the second day due to the illness of counsel. During the morning of the fourth trial day the plaintiffs called Mr. O'Connor to the witness stand. Shortly after the commencement of his direct examination, a bona fide and dramatic event took place. Mr. O'Connor evidently sustained a heart problem which required that he take a pill in the presence of the jury. He was comforted by his wife. Almost simultaneously there was a recess. Out of the presence of the jury Mr. O'Connor disclosed to the trial court that the pill which he had taken in the presence of the jury was nitroglycerin. Defense counsel, fearful that Mr. O'Connor could not be adequately cross-examined and urging that there were legitimate areas of cross-examination which were not covered by his deposition, moved for a mistrial. Defense counsel also urged that the drama of the situation was such as to create great sympathy with the plaintiffs and a resulting prejudice to the defendant. Mr. O'Connor assured the trial court that he thought that

he could resume the witness stand. There was a discussion in the absence of the jury with statements by Mr. O'Connor all of which was adequately reported by the court reporter. The trial court faced a difficult decision.

After a great deal of thought the motion for mistrial was denied and Mr. O'Connor was asked no further questions on direct examination nor did defense cross-examine. The presentation of the evidence was concluded that morning.

The formal written judgment which denied the motion for new trial and entered judgment for the $60,000 after the acceptance of the remittitur was filed on 29 January 1969. The appeal proceeded. In this Court the defendant filed a motion for substitution of parties suggesting that Mr. O'Connor had died on 7 February 1969. The plaintiff acknowledged the fact of his death. In view of the matters presented to this Court in connection with this suggestion, this Court did not then require a substitution for Mr. O'Connor.

In view of the reversal of this cause on other grounds we decline to pass upon the contentions of the defendant above set forth. There cannot be a recurrence of this problem on a new trial, should this cause again come for trial. Had a mistrial been granted, it seems doubtful that the case could have been retried prior to Mr. O'Connor's death.

### THE VERDICT

It was urged in the trial court and it is urged here that the verdict was excessive and was the result of passion and prejudice on the part of the jury. It is urged that the remittitur does not cure this impediment.

■ The complaint sought $80,000 in general damages together with an additional sum for special damages. The proven special damages were in the sum of $5,229.-65. The verdict was in the sum of $80,000. Nine jurors signed the verdict. As before stated, the plaintiffs accepted the remittitur to the figure of $60,000. In the event that a verdict is truly the product of passion

and prejudice, a remittitur will not cure that infirmity. Stallcup v. Rathbun, 76 Ariz. 63, 258 P.2d 821 (1953) and McClain v. Sinclair, 2 Ariz.App. 543, 410 P.2d 500 (1966).

The Arizona Supreme Court in Standard Oil Company of California v. Shields, 58 Ariz. 239, 119 P.2d 116 (1941), stated that one of the tests to be applied is when "the amount of the verdict as compared with the legal damages shown by the evidence is so great as to shock the conscience of the appellate court." In our opinion the trial judge exercised his sound discretion in ordering the remittitur and we do not share the opinion of the defendant that the verdict or the judgment should shock our conscience.

It is also urged that the verdict and the judgment allowed a sum in general damages which is disproportionate to the special damages. In our opinion in Myers v. Rollette, 6 Ariz.App. 43, 429 P.2d 677 (1967), we were faced with a similar argument that the general verdict was disproportionate to the amount of the special damages. Therein we stated:

"In our opinion each case must be considered on its own facts. Even should we agree with the defendant's analysis of the record, we are not willing to establish a rule of thumb relationship between special damages and the overall recovery." 6 Ariz.App. at 51, 429 P.2d at 685.

We recognize that on the review of our decision by the Arizona Supreme Court in a case reported in 103 Ariz. at page 225, 439 P.2d at page 497 (1968) our decision was vacated. We recognize that the Supreme Court held in that case that "it must be reversed for the determination of the issue of damages." We do not find in the Supreme Court opinion that our above-quoted statement was discredited by the Supreme Court and we feel free to again repeat the same statement. Historically, it may be of interest to note that the same case was again before this Court and is reported as Rollette v. Myers, 13 Ariz.App. 72, 474 P.2d 196 (1970). A petition to review the same has been denied.

We do not agree with the contentions of the defendant in the matter of the size of the verdict and the judgment.

## THE ARCHITECT'S OPINION

Robert Ellis Sexton, a graduate architect who commenced the practice of his profession in 1951, was called as an expert witness by the plaintiffs. Sexton established distances and changes in elevation in relation to the walkway and the step to the one-hundredth of an inch. It is from his testimony that we extracted our general dimensions set forth earlier in this opinion.

Over strenuous objection Sexton was permitted to testify that it would have been "good practice" to have built an inclined ramp from the public sidewalk to the entrance door of the sanctuary. It was stipulated that such a ramp, had it been built, would have been legal. When asked in relation to the construction of the step he expressed the opinion that he " * * * would not consider it good practice." When called upon to express his opinion as to which would be safer, the trial court precluded his answer by sustaining a defense objection. There was no evidence to establish that Sexton's opinion as to "good practice" did or did not meet a "standard of practice" in the community of Phoenix.

The plaintiffs rely on Hommel v. Badger State Inv. Co., 166 Wis. 235, a 1917 Wisconsin Supreme Court opinion reported in 165 Northwestern Reporter at page 20. The issue there was also a step. The Wisconsin Supreme Court quoted that State's statute as follows:

"'Every employer and every owner of a place of employment or a public building now or hereafter constructed, shall so construct, repair or maintain such place of employment or public building, and every architect shall so prepare the plans for the construction of such place of employment or public building, as to render the same safe.'"

In its opinion the Court stated:

> "Further error is assigned because the court permitted expert evidence as to whether it was good practice to construct a step such as the one in question, that as bearing on the question of whether, under the circumstances, the entry was so constructed as to be safe to tenants or the public using it as the use thereof would reasonably permit. The evidence was proper. The subject was peculiarly one for expert evidence. It related to whether, from an architectural standpoint, the place was as safe as its use would reasonably permit."

The defendant cites to us Hill v. Tung Wah Low, 126 N.J.L. 553, 19 A.2d 786 (1941), from which we quote as follows:

> "Proof of such negligence is lacking. There was no evidence to sustain the argument that the raised step in the lavatory was a structural defect. In answer to the direct question as to whether this step violates the 'standard of construction' rule, the expert witness did not answer in the affirmative but said that the condition was bad practice. 'We do not follow that type of construction. We usually get away from it by building a ramp.' Nowhere does this expert say that a 'step up' violates the rule of standard construction but rather the practice, and practice is not defined by the witness."

We recognize that experts are called upon to express their opinions as to physical facts such as accident reconstruction, defective design or construction in relation to a building which has collapsed, and the proper method of stopping a loaded truck in an emergency situation. It is our opinion that expert opinions are not appropriate in all circumstances.

■ It is our opinion that the condition of the walkway was adequately presented to the jury by excellent photographs and by verbal testimony. A "good practice" can under some circumstances be dangerous and a "bad practice" is not necessarily dangerous. In our opinion the "good practice" and the "not good practice" testimony of Sexton was lacking in probative value relative to the claimed negligence of the defendant. It was error to admit these opinions. It seems to us that these opinions could well have had a persuasive effect with the jury.

## EVIDENCE OF NO PRIOR ACCIDENTS

■ The defendant offered to prove by Monsignor Bernard L. Gordon and by Joseph John Prebil that from the time of the construction and occupancy of the sanctuary to the date of the trial there had been numerous occasions at which large numbers of people were using the walkway and that they had never received any report of any accident other than the accident experienced by the plaintiff. The Monsignor had then been the pastor of St. Gregory's prior to, during and since its construction. Prebil had a like period as caretaker and he was on the premises on the occasions when the sanctuary was in use. Three cases have been called to our attention by both sides in connection with this appeal. These cases are Fox Tucson Theatres Corp. v. Lindsay, 47 Ariz. 388, 56 P.2d 183 (1936); Buchanan v. Green, 73 Ariz. 159, 238 P.2d 1107 (1951); and Slow Development Co. v. Coulter, 88 Ariz. 122, 353 P.2d 890 (1960). From these cases it appears to this Court that the Arizona rule is that one may not show an absence of prior accidents and that prior accidents may be shown only to establish knowledge on the part of the alleged tort-feasor. In our opinion the trial court ruled in conformity with Arizona law. We express no opinion as to whether the case law in this regard should be modified when it is charged that the alleged tort-feasor knew or reasonably should have known.

## INSTRUCTION

The trial court instructed in part:

"The owner of premises is entitled to assume that the invitee will perceive that which is open and obvious to him upon the ordinary use of his own senses, and

the owner is not required to give the invitee notice or warnings of an obvious danger existing upon the premises. However, you are also instructed that the bare fact that a condition may be open and obvious does not necessarily mean that it is not unreasonably dangerous. The open and obvious condition is merely a factor to be taken into consideration in determing whether the condition was unreasonably dangerous."

The last two sentences are urged to be error. The plaintiffs rely upon Cummings v. Prater, 95 Ariz. 20, 386 P.2d 27 (1963), wherein our Supreme Court stated:

"Of course, the bare fact that a condition is 'open and obvious' does not necessarily mean that it is *not* unreasonably dangerous. Harper and James, 27.13. The open and obvious condition is merely a factor to be taken into consideration in determining whether the condition was unreasonably dangerous." (Emphasis theirs.) 95 Ariz. at 27, 386 P.2d at 31.

The last two quoted sentences of the instruction obviously were taken from the Cummings opinion. It is the opinion of this Court that appellate court decisions may announce sound propositions of law but that the manner of expressing those propositions is not always suitable for *in haec verba* quotation in the presentation of instructions to a jury.

In our opinion the sentence reading, "However, you are also instructed that the bare fact that a condition may be open and obvious does not necessarily mean that it is not unreasonably dangerous.", is a comment on the evidence and is worded in such manner as to indicate the trial court's preference in favor of the position taken by the plaintiffs. This, notwithstanding that the trial court properly instructed that the jury should not reach any conclusions as to the opinion of the court based upon instructions given. In our opinion the trial court was led into error.

We recognize that conditions may be open and obvious and at the same time dangerous if a person's attention is diverted or distracted. See the cases of Sherman v. Arno, 94 Ariz. 284, 383 P.2d 741 (1963); Murphy v. El Dorado Bowl, Inc., 2 Ariz.App. 341, 409 P.2d 57 (1965); and Yuma Furniture Co. v. Rehwinkel, 8 Ariz.App. 576, 448 P.2d 420 (1968).

By reason of the errors in permitting the "good practice" evidence by Sexton and in the above-quoted instruction we hold that the motion for new trial should have been granted. This cause is reversed for proceedings not inconsistent with this opinion.

DONOFRIO, P. J., and CAMERON, J., concur.