700 P.2d 830

Jerry JONES and Sandra Jones, husband and wife, Plaintiffs/Appellees,

v.

**PAK–MOR MANUFACTURING COMPANY, Defendant/Appellant.**

No. 2 CA–CIV 4801.

Court of Appeals of Arizona, Division 2.

Jan. 12, 1984.

Davis, Siegel & Gugino by Barry M. Davis, Tucson, for plaintiffs/appellees.

Kimble, Gothreau, Ryan, Nelson & Cannon, P.C. by William Kimble, and Jones, Dickerman, Nuckolls, Edwards & Smith, P.C. by William W. Edwards, Tucson, for defendant/appellant.

## OPINION

BIRDSALL, Chief Judge.

On January 27, 1979, appellee Jerry Jones sustained personal injuries in connection with the use of a side-loading refuse compaction machine manufactured by the appellant Pak-Mor Manufacturing Company. Appellees' initial complaint alleged various claims of negligence against Mr. Jones' employer, SCA Services of Arizona, Inc., and against a fellow employee and co-worker. The complaint was subsequently amended to add General Motors Corporation, GMC Quality Trucks, Inc., Pak-Mor Manufacturing Company, Inc., Truck Equipment Specialty Co., and National Refuse Equipment, Inc., as defendants.

The amended complaint alleged that the additional defendants had negligently developed, designed, manufactured, assembled, distributed, failed to warn, and sold the garbage collection machine on which Jerry Jones was working at the time of the injury. The complaint further alleged that said negligence was willful, wanton, and in reckless disregard of the life and safety of Mr. Jones and that the refuse collection machine was defective and unreasonably dangerous. Ultimately the appellees either voluntarily dismissed or settled their claims against all defendants except Pak-Mor.

The matter proceeded to trial in September of 1982. The jury returned a verdict in favor of appellee Jerry Jones in the amount of $1,124,000 and in favor of appellee Sandra Jones, wife of Jerry Jones, in the amount of $200,000. Judgment was entered on September 27, 1982. Pak-Mor filed a Motion for Judgment Notwithstanding the Verdict or, in the alternative, a Motion for New Trial, both of which were denied by the court in a formal written order entered on December 6, 1982. This appeal followed.

The appellant contends that the trial court erred:

(1) In excluding evidence that there had been no prior accidents involving machines of the same design over a period of 26 years prior to the accident in question;

(2) In denying defendant's motion for directed verdict, and its subsequent motion for judgment notwithstanding the verdict;

(3) In refusing to instruct the jury that a manufacturer is under no duty to guard against injury from any danger which is open, obvious or known to plaintiff;

(4) In failing to order a remittitur, inasmuch as the damages were clearly excessive.

We affirm.

The facts viewed in the light most favorable to upholding the verdict are as follows. Jerry Jones obtained work with SCA as a helper on a refuse collection route after being unable to find a job in the construction industry. He received limited instructions for working on a rear-loading machine and no instructions for working on the side-loading machine. On his third day of work, he was first assigned along with another helper to work on a side-loading machine driven by Mike Campbell. Campbell had been hired as a driver at the same time Jones was hired as a helper, and this was also only his third day on the job. The three employees began work at 6 a.m., the driver was given a map of the collection route, and they drove to an area outside of Tucson near Pima College where they began collecting garbage. The area in which they were collecting garbage was the wrong route and in fact was not a garbage collection route at all. Jones was working as the helper on the driver's side of the refuse compaction machine. His custom was to ride on the fender running board between pick-up points on the route, with his body positioned toward the machine and his head turned to the left looking toward the front of the machine and with his hands

holding onto a grab iron or rail affixed to the side of the machine. The machine contained two bay doors on each side and the doors were open as the garbage was being collected.

Jones testified that he occasionally came in contact with brush and tree limbs growing in the alleys as the refuse compaction machine was travelling from pick-up point to pick-up point. At approximately 8:00 that morning, the truck entered an alley, stopped to pick up several cans of garbage, and then continued on along a fence line. Jones was riding on the fender running board of the machine as it continued down the alley. He was not looking forward until just before the alley curved around the fence corner, and when he looked up, he saw a fence coming toward him. The driver turned the corner too sharply which caused him to hit his right cheek and his shoulder on the fence corner, and this in turn caused his body to turn approximately 180°. He yelled to the driver to stop the truck and at the same time his left leg was caught between the edge of the fender running board and the corner of the fence, causing a break of the bones in his leg approximately four to five inches above his ankle.

The driver stopped the truck and he and the helper placed Jones in the cab of the truck. He was initially taken back to the offices of SCA and later transported by ambulance to the emergency room at St. Mary's Hospital.

The product which is the subject of this litigation is a side-loading refuse compaction machine, the Pak-Mor Model 20H. Pak-Mor manufactures the compaction machine and the fender running board, and these items are mounted, usually at the Pak-Mor manufacturing facility, on a truck, cab and chassis unit supplied by any number of manufacturers. The compaction machines are provided in models ranging from the 13H to the 28H, and the numerical designations of the various models refer to the cubic yard capacity of the machine.

The original garbage machine, the AF series, was designed by Pak-Mor in 1947 and included a running board for a man to stand on while performing his duties and to ride on from stop to stop for short distances. The width of the running board was 21½ inches and provided a lateral standing surface from the back of the cab to the rear fender.

The width of the running board of the 1972 Model H was the same as that of its 1947 predecessor. The parties disagree on the configuration of the compaction machine on the 1947 and 1972 models. The appellees argue in their brief that a significant difference between the 1947 machine and the 1972 Model H was the design of the tank which abutted the running board. The appellees argue that the predecessor tank had straight sides whereas the Model H has a cylindrical configuration. They contend that the adoption of the cylindrical tank took away a significant amount of space for the worker, reducing it from 17½ to 19½ inches to 3 to 4 inches. Appellees do not, however, support this contention with any reference to the record.

The appellant, on the other hand, states that the Pak-Mor refuse compaction machine, initially designated as the Model AF in 1947, was subsequently redesignated as the Model H in 1961. In that year it was converted from a chain-driven compactor to a hydraulic compactor. The appellant further states that, in fact, the cylindrical design configuration was utilized in 1947, continuing without change to the present day. Appellant's position is supported by specific references to the record. Appellant also argues that an additional 8 inches of space is provided a worker on each side of the machine when the doors are open and that the doors would always be open when the machine was being used on route.

It is unclear what transpired during the machine's evolution to reduce the amount of space available to the worker, if, in fact, such a reduction took place. It is evident from the record that, practically speaking, excluding additional space resulting from having the doors open and regardless of the shape of the unit, a worker is provided with only 3½ to 4 inches of space within

**136**

the 96 inch maximum permissible width of the vehicle. A.R.S. § 28–1002(A) provides: "The total outside width of any vehicle or the load on the vehicle shall not exceed eight feet, [with exceptions not applicable here.]" Thus, the design of the running board and compaction machine forces a man's body to extend beyond the protected, lawful width of the vehicle.

## PRIOR ACCIDENTS

At the outset of the trial, the court granted the appellees' motion in limine to exclude evidence that there had been no similar accidents involving machines of the same design. Appellants offered to prove that the product was designed and put into production in 1947, and that the design had continued without change in the area claimed to have been defectively designed through the date of the manufacture of the subject machine in 1973. Appellants further offered to prove at trial that during approximately 26 years of use, no injuries were reported or claims made against them for any injury sustained by a side worker as a result of the collection unit passing near or being driven into a stationary object, such as occurred in this case.

■ Appellant argues that such evidence is relevant to both the negligence and strict liability claims in that it provides "some evidence" that the product was not defective or unreasonably dangerous and that it was not negligent in adopting the design. However, the trial court properly excluded such evidence. Although there is extensive contrary authority in other jurisdictions both in a negligence and strict liability context, the law of Arizona is clear that such evidence is inadmissible and we are not permitted to hold otherwise.

■ Arizona admits evidence of prior accidents, but excludes evidence of the absence of prior accidents. The reason for this rule is set forth in the early case of *Fox Tucson Theatres Corporation v. Lindsay*, 47 Ariz. 388, 56 P.2d 183 (1936) to avoid the introduction of collateral issues that would distract the jurors' attention from the central issues at hand and greatly protract the trial. The appellant argues, however, that the court in *Fox* did not intend for this to be a rule of exclusion to be applied mechanically. Rather the court was to exercise its discretion and determine whether the introduction of such evidence would, in fact, have the adverse effects which the court believed would result. Nothing in the language of *Fox*, however, suggests this intention.

Subsequent Arizona cases have similarly held that evidence of the absence of prior accidents is inadmissible in negligence actions. *Hlavaty v. Song*, 107 Ariz. 606, 491 P.2d 460 (1971); *Padilla v. Southern Pacific Transportation Company*, 131 Ariz. 533, 642 P.2d 878 (App.1982); *St. Gregory's Church v. O'Connor*, 13 Ariz.App. 421, 477 P.2d 540 (1971). In *Hlavaty*, the plaintiff was injured when she fell in a restaurant. The trial court permitted the admission of evidence of the absence of similar accidents on the defendant's premises. Our supreme court found this to be error, stating:

"Under proper circumstances, evidence of prior accidents may be admissible to show (1) the existence of a defective or dangerous condition, or (2) to give notice on the part of the defendant. See *Slow Development Company v. Coulter*, 88 Ariz. 122, 353 P.2d 890 (1960). This court has held, however, that testimony concerning freedom from previous accidents is immaterial and inadmissible. *Fox Tucson Theaters Corp. v. Lindsay*, 47 Ariz. 388, 56 P.2d 183 (1936). See also *Buchanan v. Green*, 73 Ariz. 159, 238 P.2d 1107 (1951). In this case the evidence was offered to show lack of notice and we therefore hold it was error to admit testimony concerning the absence of similar accidents on defendant's premises." 107 Ariz. at 609, 491 P.2d 460.

Appellant also argues that our courts are retreating from a strict rule of exclusion, citing *Rayner v. Stauffer Chemical Company*, 120 Ariz. 328, 585 P.2d 1240 (App. 1978), and *Tucson Industries, Inc. v. Schwartz*, 108 Ariz. 464, 501 P.2d 936 (1972).

The trial court in *Rayner* permitted evidence of absence of mishaps to show the behavior and effect of a chemical product on potatoes. In permitting this testimony, the trial court specifically recognized and affirmed the rule that lack of other accidents was inadmissible in a negligence action. The court also noted that the evidence was permitted in *Rayner*, a strict liability case, ". . . not to show the absence of mishaps but to show the behavior and effect of Eptam when used on potatoes." 120 Ariz. at 332, 585 P.2d 1240.

Pak-Mor argues that the *Rayner* opinion demonstrates a shift in Arizona away from the well-entrenched rule that lack of other accidents is inadmissible. The Court of Appeals in *Rayner* specifically rebutted that contention. In a footnote to the opinion, the court observed that:

"In this regard, it is important to note that the trial court excluded evidence intended to show only a lack of complaints regarding the use of Eptam on potatoes. This evidence was properly excluded because it failed to show or demonstrate the behavioral characteristics of Eptam."

In *Tucson Industries, supra,* plaintiff was diagnosed as suffering from chemical keratitis which had been caused by exposure to fumes from glue used in remodeling an adjacent office. One defendant attempted to introduce evidence to the effect that there had not been a single report of eye injury in the 15 to 20 years that the company had been making the Contax Cement. Appellant relies on the language of the court in *Tucson Industries* which stated:

"This is, of course, material to an action bottomed on negligence, but immaterial to an action based upon strict liability. It should however be noted that even in a negligence case, the lack of notice of injuries (1) does not establish the fact that no injuries had occurred, and (2) a long history of good fortune does not exclude a conclusion that ordinary prudence requires a warning." 108 Ariz. at 468.

The portion of the quote which states that such evidence is "material to an action bottomed on negligence" is obiter dictum, however, since the case was brought under a theory of strict liability.

The appellant also provides a lengthy analysis concerning the admissibility of lack of other accidents in a strict liability context. The appellant simply disagrees with the Arizona law which is uncontradicted that such evidence is inadmissible in an action based on strict liability. *Tucson Industries, supra; Rayner, supra.*

## MOTION FOR DIRECTED VERDICT

Appellant claims that the trial court erred in denying its motion for directed verdict and its subsequent motion for judgment notwithstanding the verdict. It contends that there was insufficient evidence from which the jury could have properly found (1) that the design of the machine was defective, (2) that the design of the machine rendered it "unreasonably dangerous," (3) that the defendant was negligent in its design of the machine, and (4) that the design of the machine was a proximate cause of the accident.

As our court pointed out in *Hohlenkamp v. Rheem Manufacturing Company,* 134 Ariz. 208, 655 P.2d 32 (App. 1982), citing *Brady v. Melody Homes Manufacturer,* 121 Ariz. 253, 589 P.2d 896 (App.1979), there are two types of design defects. The design defect which forms the basis of a claim in strict liability views the defect from the standpoint of the consumer: Is the product, because of the alleged design defect, dangerous to an extent beyond that which would be contemplated by an ordinary user when used in an intended or reasonably foreseeable manner? The design defect upon which a negligence claim can be based views the defect from the standpoint of the manufacturer: Would a reasonably prudent manufacturer have adopted the design in question?

In the instant case, the question of appellant's liability was submitted to the jury on both theories: Strict liability for

138

design defect and negligent design of the product. Since appellant's request for special interrogatories to the jury was denied, we do not know the basis for the jury's finding of liability. However, if the evidence is sufficient to support a finding of appellant's liability under either theory, the judgment must be affirmed. *Dunlap v. Jimmy GMC of Tucson, Inc.*, 136 Ariz. 338, 666 P.2d 83 (1983); *Reese v. Cradit*, 12 Ariz.App. 233, 469 P.2d 467 (1970).

■ In reviewing the trial court's denial of motions for directed verdict and for judgment notwithstanding the verdict, we must view the evidence in the light most favorable to sustaining the verdict. *Tucson Title Insurance Company v. D'Ascoli*, 94 Ariz. 230, 383 P.2d 119 (1963). Viewed in this light, we find that the evidence was sufficient to support the jury's finding of liability under both theories.

The defective design and unreasonably dangerous condition of the garbage truck was the inadequacy of space on the running board available for the worker to perform his usual duties. The riding space designated for the man while performing his duties is determined by the manufacturer's placement of the grab irons. The space available for a man's body on the running board at the position indicated by the grab irons was approximately 3½ inches.

Appellant published a brochure relating to this product which states that:

"Also loaders can ride within the maximum width of body, receiving protection when passing any object which may create a safety hazard."

The evidence adduced at trial, however, substantiates appellees' claims that it was physically impossible for a man riding on the side of the truck to fall within Pak-Mor's design representations. The space provided forces the bulk of a man's body to extend outside the plane of the running board. According to expert testimony, not only is this unsafe and inadequate for the worker, the worker is riding in an illegal position.

At trial, the appellant took the position that a rider was not to stand directly in front of the grab irons, but was to stand between them (in front of the loading bay) and receive protection by placing his body into the garbage truck, squatting beneath the curvature of the tank, or lying flat on the running board. However, expert testimony revealed that these suggestions were unsafe and imprudent. Appellant's own expert witness testified that the suggestion that a worker pull his body inside the tank was the "lesser of two evils." Not only would the worker be exposed to the odor within the tank, but also to various "pinch points."

Furthermore, evidence at trial demonstrated that it was foreseeable that the truck upon which appellee was riding would be used in roadways, thoroughfares, highways and alleyways. Appellant's expert witness admitted that it was foreseeable that the truck would be used in close quarters. The chief design engineer of the product testified that, "[I]f the alleys were narrow, he would obviously ride on the running board for safety and protection."

■ Appellant suggests that appellees' experts failed to testify that one using the vehicle in the manner in which it was intended to be used would not recognize and appreciate that he was vulnerable to injury. It further argues that, under Arizona law, unless there is evidence from which a jury could conclude the danger would not have been recognized by the ordinary user, the appellee has failed to establish one of the essential elements of his case in strict liability. This argument is similar to the one made by the appellant in *Moorer v. Clayton Manufacturing Corporation*, 128 Ariz. 565, 627 P.2d 716 (App.1981), and rejected by the court. In *Moorer* we stated:

"Neither do we agree with appellant's contention that appellee did not sustain his burden of proof since no one testified that the machine failed to perform as safely as an ordinary consumer would reasonably expect it to when the product was being used in an intended or reason-

ably foreseeable manner. Appellee's expert witness testified that the 'nip-point' made it hazardous. The jury saw pictures of the machine and heard testimony describing how the emissions control test was performed and how the accident happened. Whether the design there satisfied the strict liability standard was a question of fact for the jury. See *Byrns v. Riddell, Incorporated,* 113 Ariz. 264, 550 P.2d 1065 (1976). Cf. *Union Supply Company v. Pust, supra* [196 Colo. 162, 583 P.2d 276 (1978)]." Id. at 568, 627 P.2d 716.

Likewise in this case, expert testimony revealed the hazards to which a worker is exposed · when riding on this particular truck when being used in an intended or reasonably foreseeable manner. Sufficient evidence was presented on the defective design and the unreasonably dangerous nature of the vehicle to create a question of fact for the jury's resolution.

■ Sufficient evidence was also presented for the jury to properly conclude that the appellant was negligent in the design of its product. As previously stated, it is unclear if any change occurred in the evolution of the garbage tank that reduced the amount of space available to a worker when riding on the side of the truck. It was undisputed only that 3½ inches of space is available on the Model H machine.

Jimmie Thurmond, president of the corporation, entrusted the design of the new model to his chief design engineer, Orin Anderson. Mr. Thurmond did not have specific conversations with Mr. Anderson about the safety of riders who may be on the side running board while the vehicle was in motion. No discussion occurred relating to the position and placement of grab irons on the Model H tank. Appellant failed to direct the persons responsible for the design of the Model H to investigate or pay attention to the safety of riders on the running board of the Model H unit. Even though the appellant argues that additional space was provided to the worker if he would stand with his body in the loading area, the president of the corporation testified that, to his knowledge, this was not intended. Pak-Mor did not direct nor perform any safety testing relating to the safety of men riding on the side of the machine.

Orin Anderson was not a safety engineer, nor was he aware of what a safety engineer does. Neither Mr. Anderson nor anyone associated with the development of the Model H belonged to a professional safety organization, maintained safety registration with any organization or held a safety certificate. Neither Mr. Anderson nor others responsible for the design of the new machine and fender running board used the science of ergonomics, which applies the dimensions of men in relationship to the machine which they are using, in the design of the new Model H. Anderson did not refer to any text or details relating to the size of men who would be working on this machine, nor did he agree that a safety engineer should be familiar with human conduct in designing the machine.

In contrast, the appellee's expert witness, Mr. MacCollum, a consulting safety engineer, testified that ergonomics data has been available since studies performed by the United States Army in 1959 and that a consideration of the dimensions of men as applied to the machinery they used was imperative in arriving at a safe working situation. Karl Schulz, defendant's own expert witness agreed that it would be imprudent for a manufacturer not to have a safety committee or a person responsible for safety to consider the interplay of the worker and the machine. Mr. Schulz also agreed that it would not be prudent for a manufacturer to fail to dedicate a significant portion of its time to investigating and testing the safety of the machine and the man who worked with it. Mr. Schulz opined that it would be prudent for a refuse machine manufacturer to consider the safety of the man on the side of the machine before the truck actually went into production.

Appellant's expert witness, Charles Lemme, testified on direct examination that

140

standards promulgated by the American National Standards Institute (A.N.S.I.) were applicable at the time of the design of the Model H series and were representative of the standard and practice of manufacturers throughout the United States. In addition, Mr. Lemme testified that the standards represented the state of the art of safety at the time this machine was produced.

The A.N.S.I. enunciates standards for side-loading garbage trucks (such as the one on which the appellee was injured) and also rear-loading garbage trucks. Under the A.N.S.I. standards directed to rear-loading compaction machines, a *riding step* was defined in § 3.17.2. Yet, when asked to find the definition of *riding step* on a side-loading machine, the expert witness was unable to locate such a definition because it was not there. The expert witness conceded that the A.N.S.I. standards define *only* a *loading step* on a side-loader. Yet, on a rear-loader *riding step* is defined.

In the section of the standards addressed to rear-loading machines *riding steps* and grab rails are defined in § 7.3.7. There is no similar section under side-loaders. The side-loader speaks about *loading steps* and grab rails in § 7.5.4. Nowhere in the A.N.S.I. standards is a riding step defined as acceptable equipment or otherwise on a side-loader. The clear implication is that *riding steps* are to be used *only* on a rear-loading machine where there is adequate escape for a worker. Only a *loading step* is to be provided on a side-loading machine so that the worker will not ride on the step while performing his job.

In addition, the appellant's expert recognized a publication of the National Safety Council relating to refuse collection. The appellant's expert witness agreed that according to the National Safety Council publication it was fully expected that worker would stand where the grab irons were located. Yet, on direct examination, both Mr. Lemme and Mr. Schulz stated that the correct riding area was *not* where the grab irons were located but between the grab irons in the loading bay area. The Nation-

al Safety Council, in its publication, stated that:

"Platforms shall be within the body of the truck so that outside riders will not strike against stationary objects or be struck by passing traffic and the width of the truck shall conform to City Ordinance."

Mr. Lemme agreed that the National Safety Council was of the opinion that men should ride within the body of the truck so they wouldn't strike stationary objects or be struck by cars. Despite the clear enunciation of the National Safety Council and Pak-Mor's own representations in its brochure, the fender running board platform was not designed in accordance with the accepted standards of either the National Safety Council or the American National Standards Institute.

When a manufacturer changes part of its product without giving adequate attention to the design of another part of its product, fails to consider the safety of the worker in relationship to the new design and fails to follow the standards which it recognizes as applicable in the form of the American Standards Institute and the National Safety Council, adequate evidence is presented of the party's negligence. Accordingly, sufficient evidence was submitted to the jury in this case to justify a finding that Pak-Mor was negligent.

We also reject appellant's contention that there was insufficient evidence from which the jury could have properly found that the design of the machine was the proximate cause of the accident. As we stated in *Moorer, supra,* at 569, 627 P.2d 716, "Product defectiveness can be a proximate cause concurrently and in combination with other causes."

## JURY INSTRUCTIONS

The appellant argues that the court erred in refusing its requested jury instruction number 2 which read:

"I instruct you that under the laws of the State of Arizona, a manufacturer is under no duty to guard against injury from any danger which is open, obvious or known to plaintiff."

Instead, the court gave appellees' requested instruction:

"In determining whether a product is unreasonably dangerous you may consider the following factors. The usefulness and desireability [sic] of the product, the availability of other and safer products to meet the same need, the likelihood of injury and its probable seriousness, *the obviousness of the danger*, the common knowledge and normal public expectation of the danger, and the avoidability of injury by care in the use of the product, and the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive." (Emphasis added)

 It is well established that the trial court's failure to give a requested instruction is not error where the subject of the requested instruction is adequately covered by other given instructions. *Harris v. Murch*, 18 Ariz.App. 466, 503 P.2d 821 (1972). Here the trial court properly instructed the jury in accordance with *Byrns v. Riddell, Incorporated*, 113 Ariz. 264, 550 P.2d 1065 (1976), and *Turner v. Machine Ice Company*, 138 Ariz. 329, 674 P.2d 883 (1983), that the "obviousness of the danger" was *a* factor to be considered by the jury along with others in determining whether the truck was unreasonably dangerous. Additionally, the given instruction more accurately reflects the law regarding an open and obvious condition.

## DAMAGES AWARD

Appellant urges that the damages awarded in this case, totaling more than $1,300,-000, were clearly excessive and that the trial court should have ordered a remittitur. It argues that there was no supporting evidence to justify the verdict that was rendered and suggests that $500,000 would more accurately reflect the extent of the appellees' general and special damages.

In making this argument, appellant presents a comparison of the damages awarded to the plaintiff, Mrs. Hernandez, in *Hernandez v. State*, 128 Ariz. 30, 623 P.2d 819 (App.1980), to those damages

awarded appellee. In *Hernandez*, the plaintiff's left leg had to be amputated above the knee as a result of her injuries. The jury verdict in that case was $52,487, to which the court granted an additur of $75,000.

 This comparison is unpersuasive for two reasons. First, our courts have criticized such comparisons because of the inherent differences in the circumstances involved in any two personal injury cases. *Wry v. Dial*, 18 Ariz.App. 503, 503 P.2d 979 (1973). Second, the damages award granted in *Hernandez* and reported by appellant does not reflect the entire history of that case. In *Hernandez, supra*, our court affirmed the trial court's order granting a new trial to Mr. and Mrs. Hernandez on the issue of damages for personal injuries to Mrs. Hernandez. In this second trial, Mrs. Hernandez was awarded $1,525,000. The state unsuccessfully sought a remittitur from this verdict. The second appeal followed. In *Hernandez v. State*, 132 Ariz. 561, 647 P.2d 1159 (App.1982), our court affirmed the trial court's denial of the state's request for remittitur stating: .

"We recently considered a contention that the trial court erred in refusing a remittitur or new trial in *Garcia v. City of South Tucson*, 131 Ariz. 315, 640 P.2d 1117 (1981), where the verdict for personal injuries was $3,592,213. We held that where the trial court has refused to interfere with the jury's determination of damages we cannot interpose our judgment unless convinced that the verdict is so outrageously excessive as to suggest, at first blush, passion or prejudice." 132 Ariz. at 563, 647 P.2d 1159.

Likewise, in this case we find that the verdict was not clearly excessive. Dr. Ed Schaffer, the attending physician from Indianapolis, Indiana, testified that he told the appellee that his leg should be removed in October 1980. Appellee refused. Appellee was informed again in 1981 that removal of the leg was the appropriate treatment. The appellee chose to undergo two future operations prior to allowing the amputation to occur. Dr. Schaffer testified that the chance of success of either of these operations is small.

If the operations are successful he will have a leg-length discrepancy and will have to wear a lift. With a leg-length discrepancy, he can develop post-traumatic arthritis of the joints, low back pain and possibly arthritis of the lumbosacrial spine. The leg-length discrepancy plus the immobilization of the ankle joint for such an extended period of time creates the definite potential for development of post-traumatic degenerative arthritis of those areas. Treatment consists of medication, physical therapy if necessary, and as a last resort an ankle fusion. He will also suffer from osteomyelitis, a continuing infection in the leg which never clears and which prevents the tibia from forming a union. Any minor trauma may aggravate the osteomyelitis and may necessitate hospitalization and ultimately amputation. Indeed, Dr. Schaffer was of the opinion that amputation was the appropriate treatment and that the appellee would fare better if he would consent to that operation and begin his rehabilitation as an amputee.

The damages were not clearly excessive.

Affirmed.

HATHAWAY and HOWARD, JJ., concur.