440 P.2d 105

**LANE TITLE AND TRUST COMPANY, Appellant,**

v.

**John BRANNAN and Jewel Brannan, his wife, and Clayton E. Blakeway, Individually and dba the Wilshire Construction Company, Appellees.**

**No. 8546.**

Supreme Court of Arizona, In Division.

April 18, 1968.

Rehearing Denied May 14, 1968.

274

Jennings, Strouss, Salmon & Trask, by A. J. Pfister, Phoenix, for appellant.

Kenneth S. Scoville and Leroy W. Hofmann, Phoenix, for appellees Brannan.

Neal T. Roberts, Phoenix, for appellee Blakeway.

BERNSTEIN, Justice.

This is an appeal by Lane Title and Trust Company (hereafter referred to as Lane) from judgments entered after jury verdicts were returned against them for breach of trust. The jury awarded a verdict of $73,-800 to appellees, John and Jewel Brannan (hereafter referred to as Brannan), and $16,500 to appellee, Clayton E. Blakeway (hereafter referred to as Blakeway).

Early in 1959 Brannan agreed to sell a parcel of land in Phoenix to Blakeway for subdivision development. Pursuant to this agreement Brannan conveyed the land in trust to Lawyers Title and Trust Company. The trust instrument designated Brannan, the seller, as first beneficiary, and Blakeway, the purchaser, as second beneficiary. The total purchase price was $82,000 with a down payment of $8,200, and the balance of $73,800 to be paid in installments of $15,000 plus interest each year. Essentially the trust instrument provided that as long as Blakeway made the yearly installment payments to the trustee he would be entitled to periodic partial releases of the subdivided lots.[1] Thereafter Blakeway began negotiations to sell his beneficial interest in the trust to Res Com Builders Corporation (hereafter referred to as Res Com) at a

---

1. For example, Trust No. 398 provided: "It is further agreed and understood that at any time when Second Beneficiaries are not in default in the payment of interest or principal of the hereinbefore stated purchase price, and when not in default on account of any of their other obligations as set forth herein, any of the lots into which said property shall have been subdivided shall be released from any further right, title, interest, claim or demand of First Beneficiaries upon payment to the Trustee for the benefit of First Beneficiaries or application by the Trustee for the account of First Beneficiaries of the sum of $5,700.00 per gross acre . . . Upon the payment of the said release price, the First Beneficiaries shall thereafter have no further right, title, interest or claim in and to the lots or tracts the release price for which shall have been paid nor in and to the proceeds and avails therefrom. Each amount so paid for the release of lots shall apply to the principal balance due and shall be cumulative toward succeeding payments due unter the Agreement for Sale."

substantial profit. Etsel Denney, one of Res Com's officers, contacted Brannan and asked him if he would be willing to transfer the Brannan-Blakeway trust to Lane, with whom Res Com "did business". Brannan agreed so long as the terms of the trust remained the same. Before Lane could be substituted as trustee, however, it was necessary for Brannan to pay off some of the debts he had incurred in his transaction with Blakeway. Consequently, Brannan borrowed $12,000 from Lane, the trustee, for this purpose and signed a promissory note. A new trust instrument was then prepared by Lane which was designated as Trust No. 398. The provisions of this trust were substantially the same as the original Brannan-Blakeway trust, with Brannan as first beneficiary and Blakeway as second beneficiary. The only change of any consequence was the substitution of Lane as trustee.

Subsequently, Blakeway completed the sale of his interest in Trust No. 398 to Res Com by conveying his interest to Lane, as trustee, under a second trust numbered 411, with Blakeway as first beneficiary and Res Com as second beneficiary. The total purchase price of this interest was to be $100,-599.14 with a cash down payment of $8,432.-57 and the balance payable to Blakeway in the same manner as Blakeway's payments to Brannan under Trust No. 398. The money used by Res Com for the down payment on this property had been borrowed from Lane.

On January 1, 1960, Brannan did not receive the first annual installment due from Blakeway under Trust No. 398. Brannan's $12,000 note to Lane was also due about the same time. When Brannan contacted the president of Lane, its chief executive officer, to find out why he had not received his money the president told him that he knew the payment was overdue, and that "I will make a deal with you * * * we want you to extend." He proposed that Brannan extend the $15,000 payment due from Blakeway for six months and in return Lane would extend Brannan's note for

the same period. In addition, Lane would give Brannan the $3,000 difference. Brannan agreed. This transaction was consummated by Lane with the knowledge that Res Com was indebted to Lane in excess of $130,000.00, and that Res Com was unable to meet its current obligations as they came due. Moreover, it was apparent that Blakeway's payment to Brannan was dependent on Res Com's financial ability to pay its installment to Blakeway. Neither the president nor any other of Lane's agents informed Brannan that Res Com was in financial straits and that they owed a great deal of money to Lane.

The extension agreement prepared by Lane was not sent to Blakeway but rather to Res Com, and indeed Blakeway never received notice of this extension. In March of 1960, Lane informed Blakeway that Res Com had made the payment which was due on January 1, 1960. In fact, however, this payment was never made.

During this same extension period Lane received approximately $45,000.00 as payments on personal debts owed to them by Res Com. When the extension period lapsed on July 1, 1960, Brannan still did not receive the installment payment due him. Again he contacted Lane's president who informed him that payment had not been made. Brannan directed Lane to notify Blakeway of the demand for payment to him but this was not done until a formal written demand was sent to Lane by Brannan almost four months later. Lane then notified Blakeway of the demand for payment. In addition, Lane sent a copy of the demand to Res Com. The day after Res Com received this notice it filed a voluntary petition in bankruptcy, and was adjudicated bankrupt on November 11, 1960. All the property was then taken over by the bankruptcy court.

The principal issue raised on this appeal is whether the duties and liabilities of Lane, as a subdivision trustee, are the same as that of a common law trustee. Lane contends that its fiduciary duty is not as strict as that of a common law trustee because a

subdivision trust is more in the nature of a deed in trust, or mortgage, rather than a common law trust. This is a case of first impression in this jurisdiction, and therefore in order to analyze this proposition it is necessary to examine the nature and purposes of a subdivision trust.

In Arizona a substantial part of the real estate transactions during recent years have been the sale of large tracts of land, used either for ranching, agriculture, or merely undeveloped desert acreage held for speculation. With a shortage of the required capital to make these land acquisitions buyers who engage in subdivision development, in many instances, can only do so if they can pay for the land with the proceeds received on the sale of subdivided lots. To fill this need the subdivision trust was created.

"In some sections of the country the trust has been employed by the developers of suburban or subdivision property for the purpose of effecting the purchase and distribution of the land. The parties desiring to divide and improve the land makes (sic) [make] a contract for its purchase under which they agree that title to it shall be transferred to a trustee (usually a corporate fiduciary) in trust for the seller of the land to the extent of his unpaid purchase money and in trust for the subdivider and his nominees as to the remaining interests. Some cash is paid to the seller, and, instead of taking a mortgage for the balance of the price, he obtains equitable interests in the land under the trust and the duty of the trustee to apply the avails of sales of lots toward canceling the remaining debt from the purchaser to him. The acreage purchasers are the managers and developers of the plot, put in improvements, advertise, and procure purchasers for the lots. On performance by the buyers of the conditions precedent set forth in the trust instrument, the trustee is under a duty to convey the several lots to the purchasers thereof.

"The plan takes the place of a mortgage by the acreage buyer to his seller and also avoids the necessity of placing deeds to the lot purchasers in escrow or otherwise guaranteeing to them that they will get title to their lots, free and clear, when they perform their contracts."

Bogert, Trusts and Trustees § 250 (2d ed. 1964) (Footnotes omitted.)[2] We should note, however, that the trust instruments before us provide that "the interest of the Beneficiaries in this Trust is personal property. * * *"

The first question which must be answered is whether such an arrangement is, indeed, a trust. The essential elements of a trust are: (a) a competent settlor and a trustee; (b) a clear and unequivocal intent to create a trust; (c) an ascertainable

2. In his article "The Subdivision Trust—A Useful Device in Real Estate Transactions," 5 Ariz.L.Rev. 1, 3, George Reed Carlock describes the normal subdivision trust in the following manner:

"In a typical subdivision trust transaction, the seller conveys the land to the trustee—typically a corporate trustee and, in Arizona, typically a title insurance company—to be held and dealt with by the trustee under a trust agreement providing typically that the seller is the First Beneficiary of the trust and the buyer is the Second Beneficiary; that the buyer, while not in default, shall be entitled to possession of the property and to cause the trustee to record subdivision plats, to impose subdivision-type restrictions, to dedicate streets; and to convey portions of the property to the buyer or at his direction, free of the trust, upon payment of specified amounts on the purchase price; and often providing even more extensive rights for the buyer, while at the same time requiring the buyer to make certain payments to the trustee for the benefit of the seller, and giving the seller the right to terminate the buyer's interest in the trust in case of the buyer's default.

"Thus, if the trust is a true trust and is not a mere agency agreement or is not a passive trust executed by the Statute of Uses, each beneficiary owns a beneficial interest in the trust, which is essentially a right to require the trustee faithfully to perform its fiduciary duties, and the trustee owns the real property."

trust res; and (d) sufficiently identifiable beneficiaries. Doss v. Kalas, 94 Ariz. 247, 383 P.2d 169. In the case before us all of these elements are present. The settlor of Trust No. 398 was Brannan, and Blakeway was the settlor of Trust No. 411; Lane was designated as trustee; the trust instruments explicitly stated that the property was "declared to be held in Trust by the Trustee", clearly indicating an intention to create a trust; the trust res was the parcel of land consisting of 14½ acres in Phoenix; and the beneficiaries under both Trust No. 398 and No. 411 were clearly identified. As we see it, the very language of the instrument used by Lane necessarily leads to the conclusion that there was an intention to create a trust.

More important, however, is the question of whether these instruments create "passive trusts" which become executed by the Statute of Uses. In order that an "active trust" be created the trustee must have some duties. In the instruments before us the trustee was charged in part with the following duties:

" * * * the Trustee holds and will hold title to said property in Trust for the purposes of consummating a sale thereof from First Beneficiaries to Second Beneficiaries and for the purpose of deeding, selling, conveying, receiving payment for and otherwise handling the property upon such terms and conditions and for such prices as the Trustee may be instructed in writing so to do.

* * *"

Merely because the trustee was not granted broad discretionary powers does not make this any less an "active trust". See, e. g., Breen v. Breen, 411 Ill. 206, 103 N.E.2d 625; Chicago Title & Trust Co. v. Mercantile Bank, 300 Ill.App. 329, 20 N.E.2d 992; Crow v. Crow, 348 Ill. 241, 180 N.E. 877; Restatement (Second), Trusts § 69. Indeed, the trust device has been used for many different business purposes in recent years, and we are certain that astute attorneys will discover new uses for the trust in the future. As one commentator has observed:

"Modern business has seized upon the trust idea and has found it useful for so many novel purposes that trust companies have become veritable financial department stores ready to serve the most diverse needs, and trusteeship has become a readily available tool for everyday purposes of organization, financing, risk-shifting, credit operations, settling of disputes and liquidation of business affairs * * * the simple idea behind trusteeship * * * is that one man may be given a legal position with reference to a thing which may roughly be described as that of 'owner,' and at the same time be subjected to such changes or burdens with reference to his use of that thing for the benefit of another that the latter may be deemed the beneficial owner." Isaacs, Trusteeship in Modern Business, 42 Harv.L.Rev. 1048, 1049 (1929).

Moreover, merely because a subdivision trust can be used as a security device in place of a mortgage does not mean that it is to be treated as a mortgage. In this state a mortgagor retains legal title while the mortgagee has a lien on the property. Mortgage Inv. Co. of El Paso v. Taylor, 49 Ariz. 558, 68 P.2d 340; Steinfeld v. State, 37 Ariz. 389, 294 P. 834; Howell v. Wetzler, 32 Ariz. 130, 256 P. 365. More important, however, although the mortgagor retains possession of the property he can neither dedicate a road nor effectively subdivide the premises unless the mortgagee consents. Seale v. Berryman, 46 Ariz. 233, 49 P.2d 997, 101 A.L.R. 613. Finally, in Arizona under A.R.S. § 33–721, subsec. A a mortgage can only be foreclosed by court action, with a definite redemption period. See A.R.S. § 12–1282, subsec. A. It is apparent that the use of a subdivision trust avoids many restrictive problems created by the use of a mortgage. We hold that a subdivision trust in Arizona is to be treated as a common law trust and will be gov-

erned by the provisions of the instrument which creates it or general trust law. See Bogert, Trusts and Trustees § 250 (2nd. ed. 1964).

■ This brings us to the question whether the evidence in this case supports a finding by the jury that Lane breached its fiduciary duties. In Bulla v. Valley National Bank of Phoenix, 82 Ariz. 84, 89, 308 P.2d 932, 935, we said:

"Generally, the powers and duties of a trustee are measured by the terms of the instrument creating the trust and in the performance of these duties, he must in good faith protect the interests of all the beneficiaries and exercise the care and diligence which an ordinary prudent person under the circumstances would exercise in the management of his own affairs. In re Estate of Schuster, 35 Ariz. 457, 281 P. 38."

But more important, the trustee owes the beneficiary a duty of undivided loyalty. Restatement (Second), Trusts §§ 170, 206; Bogert, Trusts and Trustees, § 543 (2d ed. 1964).

■ In the instant case, Lane had knowledge that Res Com could not meet its obligations as they came due at the very time that the extension agreement was proposed by Lane. Indeed, Res Com was already behind in its payments on other loans to Lane. The jury could easily infer from the evidence that Lane's primary interest in getting the Brannan extension was for the sole purpose of acquiring approximately $45,000.00 from Res Com during the extension period in partial satisfaction of Lane's own personal loans. As we see it this type of conduct must be condemned. The trustee's first duty is to the beneficiary, and when a conflict of interest arises he must reveal the facts within his knowledge to the cestui que trust. For the failure to act scrupulously and with undivided loyalty the trustee will be held liable. See Restatement (Second), Trusts §§ 170, 206; Bogert, Trusts and Trustees § 543 (2nd ed. 1964).

We hold, therefore, that Lane was under a positive duty to notify both Brannan and Blakeway of its adverse interests with respect to Res Com's indebtedness. With this knowledge Brannan would then have had a choice of either ratifying the arrangment or removing Lane as trustee. Since the record shows that Lane violated its fiduciary duties the jury was justified in finding a breach of trust.

■ Appellant, Lane, further contends that the trial court committed reversible error in giving Brannan's requested instructions Nos. 1, 2, 5 and 8. This contention, however, is devoid of merit, for these instructions merely informed the jury of the trustee's duty of undivided loyalty and fidelity, and were properly given by the lower court since there was substantial evidence that the trustee violated its fiduciary duties. See, e. g., Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1.

■ Next, appellant claims that the trial court gave inconsistent instructions on the measure of damages. In addition, it is contended that the trial court, absent a request by appellant, should nevertheless have given a more detailed instruction on the measure of damages. This contention is also without merit. The lower court's instructions adequately explained to the jury that the breach of a fiduciary duty must be the proximate cause of the loss. See Restatement (Second), Trusts § 205, comment (f). Appellant would have us believe that merely because one of the court's previous instructions informed the jury that the trustee is liable for all "ensuing" damages caused by the breach that the jury was therefore misled. We do not agree. All the instructions must be considered as a whole, and since the court limited the word "ensuing" by also instructing on "proximate cause" we believe the jury was not misled. Moreover, since the court did instruct on the measure of damages no error was committed in the court's failing, on its own initiative, to give a more detailed instruction on dam-

ages. Compare, Tipton v. Burson, 73 Ariz. 144, 238 P.2d 1098.

▆ Appellant next argues that the trial court erred in refusing his requested instruction No. 4, which would have informed the jury that a beneficiary who alleges a breach of trust has the burden of proving a causal connection between the breach and the loss. We simply fail to see how this instruction would have added anything to the instruction which the court gave on proximate cause, since that instruction could only have been understood by the jury as imposing the burden of proving causation on the beneficiaries.

▆ Finally, appellant contends that the verdict was not supported by the evidence. As we have consistently held in the past on appeal we must view the evidence and the inferences to be drawn therefrom in the light most favorable to sustain the verdict and judgment of the lower court. See, e. g., Wells v. Tanner Brothers Contracting Co., 103 Ariz. 217, 439 P.2d 489. (decided April 3, 1968); Cantlay & Tanzola, Inc. v. Senner, 92 Ariz. 63, 373 P.2d 370. The evidence in this case clearly supports the jury's verdict with regard to the breach of Lane's fiduciary duties as trustee. However, the $73,800 verdict returned in favor of Brannan was, as shown by uncontradicted evidence in the record, $7,263.28 in excess of the balance due under Trust No. 398. This $7,263.28 came from the sale of three lots from Trust No. 398, and the money was then credited on Brannan's $12,000 note to Lane. Brannan argues that Lane is not entitled to a reduction in the verdict because it did not ask the trial court to modify its judgment, and therefore cannot raise this question for the first time on appeal. Where the evidence is clear and uncontroverted this court has the power to correct the judgment. Rule 60, Rules of Civil Procedure, 16 A.R.S. Consequently, it is ordered that the verdict and judgment in favor of Brannan be reduced from $73,800 to $66,536.72.

Judgment affirmed as modified.

UDALL, V. C. J., and STRUCKMEYER, J., concur.