570 P.2d 782

SEQUOIA MANUFACTURING COMPANY, INC., a California Corporation, Appellant,

v.

HALEC CONSTRUCTION CO., INC., an Arizona Corporation, Maricopa Tractor Company, Inc., an Arizona Corporation, Michael Frey and Debra Frey, husband and wife, Appellees.

MARICOPA TRACTOR COMPANY, INC., an Arizona Corporation, Appellant,

v.

HALEC CONSTRUCTION CO., INC., an Arizona Corporation, Michael Frey and Debra Frey, husband and wife, Appellees.

Michael FREY and Debra Frey, husband and wife, Appellees and Cross-Appellants,

v.

SEQUOIA MANUFACTURING CO., INC., a California Corporation, Maricopa Tractor Company, Inc., an Arizona Corporation, Appellants and Cross-Appellees.

No. 1 CA–CIV 3134.

Court of Appeals of Arizona, Division 1, Department A.

Aug. 2, 1977.

Review Denied Oct. 25, 1977.

Maupin & Wilson by Donald R. Wilson, William G. Fairbourn, Phoenix, for Sequoia Mfg. Co., Inc.

Anderson & Holloway by Jack M. Anderson and John S. Schaper, Phoenix, for Maricopa Tractor Co., Inc.

Jones, Teilborg, Sanders, Haga & Parks, P.C. by William R. Jones, Jr., James A. Teilborg, Phoenix, for Michael and Debra Frey.

Robbins, Green, O'Grady & Abbuhl, P.A. by Philip A. Robbins, Phoenix, for Halec Const. Co., Inc.

## OPINION

NELSON, Presiding Judge.

This complicated litigation arose as a result of the failure of a roll-over protection structure (ROPS) attached to a 450 Case tractor being operated by appellee and cross-appellant Michael Frey (Michael). When the ROPS collapsed, Michael was struck on the back of the head and neck by the twelve hundred pound canopy, causing him almost total permanent paralysis from the neck down.

At the time of the accident, Michael, who had married appellee and cross-appellant Debra Frey approximately six weeks previously, was employed by the appellee, Halec Construction Company, Incorporated (Halec). The 450 Case tractor had been leased by Halec with the ROPS already in place, from the appellee, appellant and cross-appellee, Maricopa Tractor Company, Inc. (Maricopa). The ROPS had been designed and manufactured by the appellant and cross-appellee Sequoia Manufacturing Co., Inc. (Sequoia).

The Freys sued Sequoia and Maricopa on theories of negligence and strict liability. Sequoia and Maricopa filed third party complaints against Halec, seeking indemnification. Maricopa filed a cross-claim against Sequoia for indemnification if found liable to the Freys solely on a strict liability theory as the lessor of a dangerously defective product, the ROPS.

Except for the cross-claim, which was subsequently ruled on by the trial judge, as a matter of law, in favor of Maricopa and against Sequoia, the case proceeded to a jury trial. As to Halec, the trial court had, by partial summary judgment, limited the indemnity question raised by Sequoia's and Maricopa's third party complaints to a Section 97, Restatement of Restitution indemnity theory. It ruled out indemnity under the lease contract between Maricopa and Halec, and the theory that Sequoia and Maricopa Tractor, if held responsible on products liability only, would be entitled to indemnity because without fault.

At the conclusion of the plaintiff's case, the trial court directed a verdict in favor of Maricopa, and against the Freys on the negligence issue. All other issues were submitted to the jury which returned verdicts in favor of Michael and against Sequoia on both strict liability and negligence theories in the sum of $3,800,000; in favor of Michael and against Maricopa on the basis of strict liability in the sum of $3,800,000; in favor of Debbie and against Sequoia on both theories, in the sum of $700,000, as

well as against Maricopa on strict liability in the same amount. The jury also found in favor of Halec and against both Sequoia and Maricopa on the single issue submitted to them on the third party complaint.

Post-trial motions for new trial and for remittitur were made. The trial court denied all post-trial motions except for the remittitur and ordered a reduction in the verdict of $1,000,000 as to Michael and $300,000 as to Debbie. The remittiturs were accepted and the judgments were amended accordingly. Appeals were thereafter perfected by all parties except Halec.

Sequoia appealed from the verdict and judgment entered in favor of the Freys, the verdict and judgment entered in favor of Halec on Sequoia's third party complaint, and the judgment entered in favor of Maricopa on Maricopa's cross-claim. Maricopa appealed from the verdict and judgment entered in favor of the Freys and from the verdict and judgment in favor of Halec on Maricopa's third-party complaint. The Freys cross-appealed from the remittitur entered in favor of Sequoia and Maricopa.

We will discuss the various questions presented as we resolve the separate appeals. Those appeals which have common questions, or questions which pertain to more than one appeal, but not to all, will be resolved together. The issue raised regarding an agreement between the Freys and Maricopa, entered into just prior to the close of the plaintiffs' case, which provided for an interest-free loan to the Freys from Maricopa's insurance carrier in the amount of $2,500 per month, limited Maricopa's total liability to the amount of its insurance coverage ($500,000), and provided for the order of execution on any judgment Freys might obtain against both Maricopa and Sequoia, will be discussed at the conclusion of this decision.

## SEQUOIA AND MARICOPA v. FREYS—LIABILITY [1]

◼ Viewing the evidence in a light most favorable to supporting the verdicts of the jury, *Harvey v. Kellin*, 115 Ariz. 496, 566 P.2d 297 (1977); *Farm-Aero Service Inc. v. Henning Produce Inc.*, 23 Ariz.App. 239, 532 P.2d 181 (1975); *E. L. Jones Construction Co. v. Noland*, 105 Ariz. 446, 466 P.2d 740 (1970); *Lane Title and Trust Company v. Brannan*, 103 Ariz. 272, 440 P.2d 105 (1968); we find ample, if not overwhelming support for the conclusions that Sequoia was negligent in its construction of the ROPS, that the ROPS was defective when it left Sequoia after manufacture, and that the defect made the ROPS unreasonably dangerous to the user. *Rogers v. Unimac Company, Inc.*, 115 Ariz. 304, 565 P.2d 181 (1977); *Byrns v. Riddell, Incorporated*, 113 Ariz. 264, 550 P.2d 1065 (1976); Restatement (Second) of Torts, § 402A (1965).

The record indicates that the welds which held together the posts of the ROPS and the canopy which fractured Michael's spine, were defective according to almost any standard, including Sequoia's own plans and specifications.

Dr. Guy Marshall Pound, a Professor of Material Science at Stanford University, and Dr. Bernard Ross, a consulting engineer with a Ph.D. in Structural and Stress Analysis, were called upon to examine the ROPS to determine, if possible, the cause of its collapse. After careful scientific analysis, including the use of an electron microscope to photograph portions of the fracture surface of the ROPS at a magnification of some 17,000 times normal size, these experts concluded that the ROPS had failed at the weldsites due to gradual fatigue caused by improper welding. Incomplete penetration of the weld encouraged the fractures, and hundreds of thousands of cycles of vibrations from the tractor caused the fractures to grow from the inside out, until the whole weld failed, causing first one post to drop, and then the other post, allowing the canopy to fall and strike Michael.

The experts were adamant that no single external force, such as might be applied by cables wrapped around the ROPS in alleged situations of misuse or abuse, was responsible for the failure of the ROPS in question.

1. The amount of the damage award will be reviewed in the resolution of the cross appeal.

Only the gradual stress of the vibration of the tractor in its normal use was the evident cause of the failure of this structure at its weldsites. This failure would not have occurred except for the substandard weldments.

In our view of the record, these conclusions are not only fully supported by the other evidence, they are, in fact, almost unchallenged. There is, to be sure, some speculative and hypothetical evidence as to what might have occurred if something else had happened to the ROPS. As previously stated, Drs. Pound and Ross were positive that even if these events had taken place, e. g., use of cables around the ROPS, use of cables around canopy to improve traction when the tractor was high centered on mud, the sole cause of the failure of the structure was the incomplete penetration of the weld, causing the gradual fracture of the metal at the weldsites. All of the credible evidence relating to what happened to this ROPS points solely to this conclusion.

In light of this fact, none of the questions presented which in any way relate to the liability of Sequoia and Maricopa to the Freys for the injury suffered by Michael, including those issues relating to the agreement, *infra,* even if resolved in favor of Sequoia and Maricopa, would be prejudicial to this aspect of the case, nor is there any reasonable probability that the verdict, as to liability, would have been any different had all of the rulings complained of gone the other way at the trial court. *Phoenix Western Holding Corporation v. Gleeson,* 18 Ariz.App. 60, 500 P.2d 320 (1972); *State v. Dutton,* 83 Ariz. 193, 318 P.2d 667 (1957).

### INSTRUCTIONS

██ Both Sequoia and Maricopa allege error in the trial court's failure to instruct the jury on the doctrine of intervening and superseding cause. *See Herzberg v. White,* 49 Ariz. 313, 66 P.2d 253 (1937); *Hemet Dodge v. Gryder,* 23 Ariz.App. 523, 534 P.2d 454 (1975); *Stroud v. Dorr-Oliver, Inc.,* 112 Ariz. 403, 542 P.2d 1102 (1975), and authorities cited therein. The trial court was correct in light of the facts set forth above and the law as found in *Stroud, Hemet Dodge* and *White, supra.*

Assuming all the evidence either actually admitted or proffered by Sequoia to be true, it is highly unlikely that Halec's use or alleged abuse of the tractor and ROPS constituted an intervening cause. It clearly was not a superseding cause. According to the nature of the fractures of the weldments, nothing Halec actually did or allegedly did, except the normal driving of the tractor, caused the collapse of the ROPS. The only conduct of Halec properly before the court on this issue, as well as on the issues of indemnification for conduct, as opposed to contract, *infra,* is Halec's negligence, or alleged gross negligence in failing to promptly repair the ROPS once the right post had fallen or at least to have removed the tractor from service until such action could be taken.

Assuming Halec's conduct to be negligent for purposes of this issue, can it be said to have "actively operated to produce the harm ___ upon a condition that had become passive"? *Hemet Dodge v. Gryder, supra,* 23 Ariz.App. at 528, 534 P.2d at 459. We do not think so. The condition created by Sequoia never became passive, nor did the slow, or perhaps even lax, maintenance schedule of Halec ever really produce the harm at all. The harm merely could have been forestalled had Halec repaired the right post under a reasonable maintenance schedule. We view the evidence to be conclusive, in light of the microscopic analysis necessary to pinpoint the cause of this tragedy, that Halec had no way of knowing, or even suspecting the existence of the insidious defect that had already caused the right post to fail and was eating away at the structure of the left support from the inside out. According to this record, a properly welded ROPS would have stood on the remaining three posts almost indefinitely. Absent that kind of knowledge, it cannot be said that Halec's conduct actively operated to produce the harm in question.

Even if it did, it cannot be said that delayed maintenance and repair of a nondisabling and apparently non-dangerous de-

fect in a piece of heavy equipment used at a busy construction site "could not have been reasonably foreseen and anticipated". *Hemet Dodge, supra.* The delay in repair was not "extraordinary" or uncommon. Refusal of the trial judge to instruct on intervening and superseding cause was not error.

■ Sequoia also complains as to the issue of strict liability in tort, it was error for the trial court to refuse to give Sequoia's offered instructions regarding mishandling or abuse.[2] *Restatement (Second) of Torts,* § 402A. There was no error in this regard. In addition to the facts as set out above failing to support any mishandling or abuse which made the ROPS harmful, the trial court did instruct the jury that the "rule of strict liability does not apply unless the product reaches the user or consumer without substantial change in the condition in which it was sold".

■ Assuming that Sequoia's offered instruction is correct statement of the law on strict liability in tort, (see Note 2), a party is not entitled to its own instruction simply because it is a correct statement of the law. *Baker v. Atchison, Topeka and Santa Fe Railway Company,* 11 Ariz.App. 387, 464 P.2d 974 (1970). The court adequately instructed on this issue and counsel could and did effectively argue from those instructions. It was not error to refuse to instruct further on the subject. *Brierley v. Anaconda Company,* 111 Ariz. 8, 522 P.2d 1085 (1974).

### Evidentiary Rulings

Sequoia calls into question a number of the trial court's evidentiary rulings. Although some of these questions may well be more germane to the third party complaint, they also have some bearing upon the court's refusal to give an intervening and superseding instruction, *supra,* and will therefore be considered at this point in our decision.

■ Initially, it must again be emphasized that the trial court has broad discretion in its rulings admitting or rejecting evidence in the course of a long and difficult trial. *Falcher v. St. Luke's Hospital Medical Center,* 19 Ariz.App. 247, 506 P.2d 287 (1973). Those rulings will not be disturbed unless a clear abuse of discretion appears and prejudice results therefrom. *Phoenix Western Holding Corporation v. Gleeson, supra.*

Two rulings were based upon procedural grounds. Three former employees of Halec were prohibited from testifying at all, and an engineer was prohibited from testifying to the results of an experiment he had devised regarding the stresses placed upon a tractor such as the one in question, or on the ROPS, by the suction effect of being pulled from mud. The engineer had constructed a device to demonstrate his experiment which was also excluded.

Although the court heard offers of proof in each instance, and stated that most of the offered evidence would either be cumulative or inadmissible anyway, his actual reason for not allowing the evidence was otherwise:

> "It will be the ruling of the court granting the motions of each of the other parties to exclude the testimony of these three witnesses * * *. They are last minute surprise witnesses, and will work a severe prejudice to the other parties, contrary to the spirit in which this case was prepared and tried."

The ruling regarding the "mud" experiment was similar.

The record in this case reflects that all parties utilized every discovery procedure available to be fully prepared for every eventuality. The first time any of the parties, other than Sequoia, would have known even the names of the excluded witnesses, let alone what they were going to testify about, would have been when they were called to the witness stand in front of the jury. A similar surprise was intended with the "mud" experiment.

---

**2.** . . . a seller of a product is not subject to liability when after the sale of the product, the product is mishandled or abused making it harmful to subsequent users.

■ Trials are supposed to be a search for the truth and not a guessing game. That is the primary purpose of the broad rules of discovery. Rules 26 through 37, Rules of Civil Procedure, 16 A.R.S.; *Cornet Stores v. Superior Court In and For County of Yavapai*, 108 Ariz. 84, 492 P.2d 1191 (1972). The court did not abuse its discretion in excluding the evidence. *Adroit Supply Company v. Electric Mutual Liability Insurance Company*, 112 Ariz. 385, 542 P.2d 810 (1975); *Carver v. Salt River Valley Water Users' Association*, 104 Ariz. 513, 456 P.2d 371 (1969).

The matter of regulations and requirements of the federal Occupational Safety and Health Administration (OSHA) was interjected into the trial on at least two issues and both are urged here as error.

■ First, Jerry Lane, Halec's superintendent, testified as to his understanding of the OSHA requirements regarding the strength of a ROPS unit before it could be marketed. No documents were introduced to support this testimony. Secondly, Dr. Jack Ward, an Arizona State University Professor of Construction was prohibited from testifying as to numerous OSHA safety regulations and generally accepted construction trade safety practices. Voluminous OSHA regulations were offered in conjunction with Dr. Ward's testimony, on the last day of trial.

As to relevancy, Lane's testimony as to what he understood OSHA's standards regarding the construction of a ROPS to be, was vital to the only issue legitimately presented against Halec—its delay in repairing the fallen right rear post. The remainder of the record clearly shows his understanding to be correct, regardless of the general source of his belief: a properly constructed ROPS would not have collapsed as it did, regardless as to how the right post had been knocked down.

A review of Jack Ward's testimony, on the other hand, shows it was not presented to rebut Lane's testimony regarding OSHA's requirements in constructing a ROPS but was introduced in an attempt to show general safety standards which Halec allegedly failed to meet. In light of our holding, *supra*, regarding the causation of the collapse of the ROPS, the relevancy of such evidence is questionable. In any event the hypothetical questions posed to Ward were imprecise and the voluminous OSHA regulations were not listed as exhibits prior to trial, nor were they specified with particularity as to which applied to this case and which did not. The court did not abuse its discretion on these rulings. *Burgbacher v. Mellor*, 112 Ariz. 481, 543 P.2d 1110 (1975).

■ Testimony was admitted that another Sequoia ROPS placed on another Maricopa tractor had similar fractures at the weldsites. There was no abuse of the trial court's considerable discretion in determining whether all the circumstances were sufficiently shown (time, place, conditions, etc.) to make this fact relevant to the issues in the case. *Burgbacher v. Mellor, supra.*

### Arguments of Counsel

■ This was a hotly contested case tried by aggressive, competent counsel. Sequoia has pointed out two instances where argument was allegedly improper and prejudicial. In opening argument reference was made to a statement of a witness, made in deposition but excluded from the trial by the court, to the effect that the ROPS could have been held together better with "bubble gum". Assuming the reference to be improper, in light of the overwhelming evidence as to the defective welds, such a remark was not so prejudicial as to require a mistrial. *E. L. Jones Construction Company v. Noland, supra.*

■ In closing argument, reference was made to the second ROPS, *supra*. We find no abuse of the wide latitude given counsel to argue their case to the jury. *City of Phoenix v. Boggs*, 1 Ariz.App. 370, 403 P.2d 305 (1965).

■ Sequoia also strenuously objected to the order of the closing arguments, urging that Freys should not be permitted the final say because of the third party complaints. Rule 51(c), Rules of Civil Proce-

dure, 16 A.R.S., gives the court specific authority to prescribe the order of arguments in cases such as this involving multiple parties and multiple claims. There was no error in the order of argument. *See generally Daru v. Martin*, 89 Ariz. 373, 363 P.2d 61 (1961).

### *Interrogatories to the Jury*

■ Pursuant to Rule 49(h), Rules of Civil Procedure, 16 A.R.S., Sequoia submitted 11 interrogatories to be answered by the jury. No other party submitted any such requests. The court refused to give any of the interrogatories to the jury in addition to the form of general verdicts given to them on each claim.

We have reviewed the entire record in this matter and find that the trial court did not abuse its discretion. *Patania v. Silverstone*, 3 Ariz.App. 424, 415 P.2d 139 (1966); *Powell v. Langford*, 58 Ariz. 281, 119 P.2d 230 (1941). The matters referred to in the requested interrogatories were properly covered in the instructions to the jury and in the general verdicts submitted. *Patania v. Silverstone, supra.*

### SEQUOIA v. MARICOPA

Maricopa's claim for indemnity against Sequoia is based upon the concept enunciated in *Allison Steel Manufacturing Co. v. Superior Court*, 20 Ariz.App. 185, 511 P.2d 198 (1973) that a retailer, or lessor, as here, of a defective product, which causes damage for which the lessor is held strictly liable because of its position in the chain of those placing the defective product in the stream of commerce, may, absent active participation in the creation of the defect causing the injury, seek indemnity from the manufacturer whose process created the defect.

■ Maricopa did not create the defect. Based upon the evidence, no regular inspection program of Maricopa's leased equip-

ment would have informed it of the latent defect in this ROPS. The trial court's decisions in granting a directed verdict in Maricopa's favor on Frey's negligence count and in entering judgment as a matter of law in its favor against Sequoia for indemnity are unassailable.

### SEQUOIA AND MARICOPA v. HALEC

We think the decision of this Court in *Allison Steel Manufacturing Company v. Superior Court, supra*, and its companion decision in the Supreme Court of Arizona, *Stroud v. Dorr-Oliver, Inc., supra*, are essentially on all fours with the questions presented here. While different parties won at each stage, the elements of workmen's compensation, negligence, gross negligence, strict liability, the viability of recovery under Restatement of Restitution § 97,[3] and indemnity under a contract provision similar in intent to that between Maricopa and Halec, are all discussed therein and control our resolution of this case.

We have read the instructions in light of the decisions of the courts in *Allison Steel* and *Stroud, supra*, and do not find them confusing or contradictory. While we might not have submitted the case to the jury in light of our analysis of the evidence, *supra*, clearly the jury's finding on the issue reinforces our view that at best (or worst), Halec was merely a joint tortfeasor, and was in no way guilty of "reckless or intentional" conduct, or "knew of the peril" Michael was in at the time of the accident. § 97, *supra*.

Only if Halec had known what took two experts and an electron microscope to later prove, would it have "known of the peril" it placed Michael in when directing him to use the tractor with the right rear post down, and probably have been guilty of "reckless and intentional wrongful conduct" within the meaning of § 97, *supra*. There is even a serious question regarding negligence in the

---

**3.** "A person whose negligent conduct combined with the reckless or intentional wrongful conduct of another has resulted in injury for which both have become liable in tort to a third person is entitled to indemnity from the other for expenditures properly made in the discharge of such liability, if the other knew of the peril and could have averted the harm at a time when the negligent tort-feasor could not have done so."

repair, since the uncontradicted testimony is that as soon as a responsible party of Halec, in this instance Jerry Lane, knew the right rear post was down, he parked the vehicle and radioed the maintenance shop to have it welded. Without the certain knowledge of the latent defect in the welds, it is probable that no further efforts to prevent the interim use of the tractor before the welder could get to it were required by the law of negligence.

■ Maricopa urges that since the trial court directed a verdict in its favor on negligence, its liability to Freys was without "fault" and therefore different rules apply. We disagree. *Allison Steel Manufacturing Company v. Superior Court, supra*, clearly stands for the proposition that a person seeking indemnification under § 97 of the *Restatement of Restitution, supra*, even if held on a theory of strict liability is, as to a party not in the chain of strict liability, an active participant in the liability causing event and therefore must show the reckless or intentional conduct and awareness of peril discussed above.

■ Maricopa also urges it was entitled to have its claim submitted under § 96 of the *Restatement of Restitution.*[4] The answer to that question is that Maricopa was not subjected to tort liability by the unauthorized or wrongful conduct of Halec, but of Sequoia. This essentially is the reason for allowing recovery by Maricopa on its cross-claim against Sequoia, *supra*.

Finally, Maricopa urges that it is entitled to indemnity by virtue of its lease contract provision:

4. "A person who, without personal fault, has become subject to tort liability for the unauthorized or wrongful conduct of another, is entitled to indemnity from the other for expenditures properly made in the discharge of such liability."

5. The agreement in question was never reduced to writing. Although we have discussed it to some extent in the body of the opinion, the agreement, as it was initially revealed orally to the trial court in the transcript of record is as follows:

"Lessee covenants and agrees to keep the Lessor harmless and free from any and all liability arising out of the use, maintenance and/or delivery of said equipment, and further covenants and agrees to pay Lessor in full for any and all damages caused to, or suffered by, said equipment from the time of departure from Lessor's warehouse to the time of return to Lessor's warehouse."

■ Again we believe the concepts enunciated in the *Allison* and *Stroud* cases, *supra*, are controlling. Those cases reaffirm the position taken by this Court in *Royal Properties Inc. v. Arizona Title Insurance & Trust Company*, 13 Ariz.App. 376, 476 P.2d 897 (1970), stating that:

"[T]he indemnitee is not entitled to be compensated for losses occasioned by its own wrong unless the indemnity agreement expresses such intention in clear and unequivocal terms." 13 Ariz.App. at 377–378, 476 P.2d at 898–899.

■ In light of our decision earlier, Maricopa's "wrong" here is continuing a defective product in the stream of commerce. *Allison Steel, supra*. If Maricopa wants to be indemnified for this wrong, as it might well seek indemnification by its lessee for Maricopa's own negligence, that intention must be spelled out in the lease in "clear and unequivocal terms". *Royal Properties, supra*.

The issues raised in the third party complaints were properly resolved against Sequoia and Maricopa.

### THE AGREEMENT [5]

■ While the Freys and Maricopa describe the agreement referred to earlier as a "loan receipt" agreement (*see Annot.* 62

"[Counsel for Maricopa is addressing the court in chambers]:

Now, in connection with the Court's inquiry; indeed it's a legitimate one—I think it now appropriate to state to your Honor and to all counsel and for this record a meeting of the minds, that is, Mr. Jones and Teilborg and I have come to, as follows. I stand corrected by Mr. Jones or Teilborg, because I don't have anything in writing in front of me.

If the plaintiffs, your Honor, are successful in obtaining a judgment against Sequoia and Maricopa Tractor, within 45 days from the

A.L.R.3d 1111, and cases cited therein), the recent decision of the Arizona Supreme Court in *Mustang Equipment, Inc. v. Welch*, 115 Ariz. 206, 564 P.2d 895 (1977), makes it clear that the agreement entered into here is in fact a "Gallagher agreement", and subject to all the requirements thereof. *Mustang Equipment, Inc. v. Welch, supra. See also: City of Tucson v. Gallagher*, 108 Ariz. 140, 493 P.2d 1197, 65 A.L.R.3d 597 (1972); *Damron v. Sledge*, 105 Ariz. 151, 460 P.2d 997 (1969); *Hemet Dodge v. Gryder, supra; City of Glendale v. Bradshaw*, 16 Ariz.App. 348, 493 P.2d 515 (1972), *supplemented on rehearing*, 16 Ariz.App. 483, 494 P.2d 383 (1972), *affirmed in part, reversed in part*, 108 Ariz. 582, 503 P.2d 803 (1972).

Just as the discussion in *Mustang, supra*, makes it clear the agreement now before us is a "Gallagher", it also makes it clear that such agreements are still valid in Arizona as a matter of public policy while continuing to recognize some inherent conflicts between efforts to resolve controversies through compromise and settlement and ef-

forts to maintain absolute purity in the adversary system.

There are really only two issues before us relating to the agreement. It was disclosed "at the earliest possible opportunity", as now clearly mandated by *Mustang, supra*, and should the jury in this case have been made aware of the agreement?

According to the record before us, counsel for Freys and Maricopa entered into the negotiations specifically leading up to this agreement the night before the plaintiffs (Freys) rested their case. This is, of course, not to say that the Freys and Maricopa, as well as Sequoia and Halec, had not been trying to settle this case from the beginning. They simply had been unable to reach a meeting of the minds.

The agreement was finalized just prior to the morning session of court on December 18, 1974 and presented to court and counsel that same morning, after the plaintiff rested, during an extensive session in chambers wherein motions for directed verdicts, among other things, were presented.

date of that judgment my people [Maricopa's insurance carrier], in order to help this young couple immediately get the things that I think the evidence indicates they need: their education, their move of residence, adequate transportation, modification of their residence, we will loan to Mike and Debbie the sum of $2500 per month, without interest, if the plaintiffs were fortunate enough to get a judgment in this case by jury verdict against Sequoia, and that judgment is ultimately satisfied, my people will receive repayment, in full, from Mike and Debbie.

In the meantime, this source of funds gives this young couple immediate cash in hand to do what is necessary.

If the plaintiffs are successful in obtaining a jury verdict on a judgment against both Sequoia and Maricopa Tractor, and in that event plaintiffs will seek satisfaction of the judgment in full, first from Sequoia and/or USF&G, as the case may be.

If indeed they are unsuccessful after reasonable efforts, then my liability policy will come into effect up to its policy limits.

This agreement, this meeting of the minds, Judge, in no way whatsoever alters, changes or modifies my approach to this lawsuit and in no way alters, changes or modifies the fashion in which I would try to adequately represent my clients, assuming for the mo-

ment that this meeting of the minds did not even occur.

\*   \*   \*   \*   \*   \*

MR. ANDERSON: But in the event—in the event, your Honor, that we indeed go to the jury on indemnity, and this is a little premature, because none of us have really made out our case against Halec yet, our full case against Halec, that if we are successful in indeed obtaining judgment against Halec on the third party complaint by Maricopa, and indeed receive any funds as a result of that aspect of the case, these funds would be held in trust for Mike and Debbie.

MR. ROBBINS: May I ask a couple of questions, because I think there are a couple of aspects of this that concern me. It's my understanding that the agreement as you state it would contemplate, in all events, an upper limit of $500,000 being placed upon the liability of Maricopa tractor?

MR. ANDERSON: That is true.

MR. ROBBINS: All right.

MR. JONES: That's correct.

MR. ROBBINS: And it's also my understanding, if I heard correctly, that the plaintiffs would first attempt to execute against Sequoia and USF&G and that that would include the pursuit to a reasonable degree of effort of a bad faith claim against USF&G?

MR. JONES: That's also correct."

Counsel for Sequoia, both in the trial court and here, has intimated, if not directly alleged, that the agreement in question was entered into sometime before and only revealed to the court and opposing counsel at all because Sequoia offered its policy limits at that time to settle the claim. Had that been the case, the agreement would have been invalid, *Mustang Equipment, Inc. v. Welch, supra,* and the trial court could have imposed sanctions, including mistrial or dismissal as to Sequoia.

We believe, however, that the matter of when this agreement was entered into by counsel for Maricopa and Freys is conclusively settled by the action in the trial court. It is not sufficient for opposing counsel to state: "Like I say, your honor, I have no way of knowing [when the agreement was entered into]." Agreeing counsel offered to be sworn. Opposing counsel could have presented any evidence he had as to the time of the agreement, plus the argument that counsel's conduct at trial reflected an earlier existing agreement. The offer to litigate this issue in the trial court was not accepted. Counsel cannot here urge the issue.

■ We believe that under the doctrine of disclosure enunciated in *Mustang, supra,* and anticipated by counsel herein, disclosure of the agreement at the first recess of court on the morning it was finalized was timely.

The broader question, and the issue not yet squarely addressed by any appellate court in this jurisdiction is: when, if ever, should agreements such as this one be presented to the jury? Procedurally, Sequoia raised this issue at all proper stages of the proceeding and was refused either the opportunity to prove the agreement in front of the jury or to have the matter presented to the jury as part of the court's instructions. The matter is squarely presented for decision.

The threshold question is: should they ever be presented to the jury, or are they *too* relevant, like similar bad acts; *State v. Denny,* 27 Ariz.App. 354, 555 P.2d 111 (1976); the presence of insurance or work-men's compensation insurance; *Muehlebach v. Mercer Mortuary and Chapel, Inc.,* 93 Ariz. 60, 378 P.2d 741 (1963); *E. L. Jones Construction Company v. Noland, supra;* *Stroud v. Dorr-Oliver, Inc., supra;* *State v. Juengel,* 15 Ariz.App. 495, 489 P.2d 869 (1971); *Myers v. Rollette,* 6 Ariz.App. 43, 429 P.2d 677 (1967), vacated on other grounds, 103 Ariz. 225, 439 P.2d 497 (1968), appeal after remand, 13 Ariz.App. 72, 474 P.2d 196 (1970); and thus prima facie prejudicial. *Cf. Egurrola v. Szychowski,* 95 Ariz. 194, 388 P.2d 242 (1964).

■ We believe there are clearly circumstances in which *Gallagher* agreements should be admitted into evidence or made known to the jury by way of instruction, for limited purposes. The classic situation wherein this would not only be permissible but probably obligatory if requested by the non-agreeing party, is where the agreeing defendant can improve his financial position by insuring a verdict of a certain amount, or over a certain amount against the non-agreeing defendant. The *Gallagher* case itself presented this situation. The Supreme Court, in its decision, *City of Tucson v. Gallagher, supra,* 108 Ariz. 140, 493 P.2d 1197 (1972) indicated there was "nothing to stop the city attorney from cross-examining at length". The Court of Appeals decision, *City of Tucson v. Gallagher,* 14 Ariz.App. 385, 483 P.2d 798 (1971), developed this reasoning a little more extensively:

"McMahon, the defendant with whom the agreement was made, took the stand as a witness. It was to his advantage to testify to facts that would show negligence by the city. For if the city had been found free of negligence, McMahon was required to pay plaintiff $10,000. If the city were found negligent, McMahon was to pay only the difference between the judgment and $10,000, or if the judgment was $10,000 or more, nothing. Counsel for City of Tucson cross-examined McMahon and had ample opportunity to bring to light the agreement and any correlative bias or prejudice associated with it." 14 Ariz.App. at 387, 483 P.2d at 800.

This position is consistent with a similar situation which exists in Florida in regard to what they label "Mary Carter Agreements". *See generally*: *Booth v. Mary Carter Paint Company*, 202 So.2d 8 (Fla.App.1967); *Ward v. Ochoa*, 284 So.2d 385 (Fla.1973), cited in *Mustang, supra*; *Kuhns v. Fenton*, 288 So.2d 253 (Fla.1974); *Imperial Elevator Company, Inc. v. Cohen*, 311 So.2d 732 (Fla.App.1975).

This does not, however, solve any problems in this case. The clear intention of the Arizona Supreme Court in *Mustang Equipment, Inc. v. Welch, supra*, is to include in the "Gallagher" category all covenants, assuming the requisite elements of consent and consideration are present, involving plaintiffs and settling codefendants, even if there is no agreement or incentive to sabotage the non-agreeing defendants or to enhance the plaintiffs' total verdict or verdict against the non-agreeing defendants.

In the case at bar, the primary purpose of the agreement was to limit Maricopa's liability to its insurance policy limits, a very critical factor since Maricopa was solvent for an amount considerably in excess of the $500,000 limit. While there was a slim possibility of escaping without paying anything, depending upon the total amount of the verdict, the solvency of Sequoia, and the remote possibility of the success of a bad faith claim against Sequoia's insurance carrier, Maricopa's basic motivation was to limit its maximum liability to Freys, faced with what all counsel and the court viewed as a grievous injury pointing to a probable seven figure verdict against someone, and there was no real advantage to Maricopa to increase plaintiffs' verdict against Sequoia, since in all probability it would have the same verdict rendered against it.

Like the court in *Mustang, supra*, we believe this agreement, by its nature, did not encourage fraud or collusion, nor was the trial strategy of Maricopa any different than we might have expected it to be absent the agreement. Michael was severely injured and both he and Debra were apparently outstanding witnesses. Plaintiffs' expert testimony was virtually unassailable and Maricopa reasoned that a substantial verdict probably was going to be rendered against it. Trying to emphasize its only "out", the possible intervening and superseding conduct of Halec, a long shot at best, and being clearly sympathetic to the plight of the Freys in order to minimize the impact of the overall situation on the jury, was not an unreasonable trial strategy.

However, unlike *Mustang, supra*, there are allegations here, as there were in the trial court, of fraud and collusion, if not in a deliberate sense, at least as a matter of law in the manner in which Maricopa conducted its case. Great prejudice as a result of the agreement is urged here, whereas no real prejudice was urged in *Mustang*.

In this in-between situation, we believe a trial court is in a unique position to view the factors surrounding such an agreement and to decide, when requested, whether such an agreement should be admitted. The record in this case reflects the wisdom of such a holding. The trial court was aware of all the adverse possibilities inherent in the existence of the agreement and was fully prepared to impose sanctions, if necessary, to prevent injustice, up to and including admitting the agreement into evidence. After observing the conduct of all counsel, their demeanor, their witnesses, and the overall atmosphere of the courtroom, the trial judge determined it unnecessary in this case to disclose the agreement to the jury. In an instance such as this, we invest the trial court with considerable discretion. We find no abuse of discretion.

Had we the authority, *McKay v. Industrial Commission*, 103 Ariz. 191, 438 P.2d 757 (1968), we might review the problems inherent in the doctrine prohibiting contribution between joint tortfeasors, see Court of Appeals opinion in *Mustang Equipment, Inc. v. Welch*, 115 Ariz. 376 (App.), 565 P.2d 882 (1976), as well as the problems of a modern day jury, obviously aware of the existence of insurance in cases such as this, but totally unaware of the limits thereof even on apparently large, solvent corporations, or the existence of, or at least the scope of workmen's compensation payments, in ade-

quately resolving the complex issues presented to it in cases such as this one. *See also Allison Steel Manufacturing Co. v. Superior Court*, 20 Ariz.App. 185, 511 P.2d 198 (1973), *supra*, and *Stroud v. Dorr-Oliver, Inc.*, 112 Ariz. 403, 542 P.2d 1102 (1975), *supra*. We believe, however, these problems are ripe for review, either by our Supreme Court, the Legislature, or both, to insure the continued fairness of our system for all litigants.

### FREYS v. SEQUOIA AND MARICOPA

■ The Freys have appealed the granting of a remittitur pursuant to Rule 59(i), Rules of Civil Procedure, 16 A.R.S., in the amount of $1,000,000 as to Michael and $300,000 as to Debra. Rule 59(i)(2) makes it clear plaintiffs have a right to such an appeal, the other parties having perfected their appeals from the reduced verdict. *See: State Bar Committee Note*, Rule 59(i), *supra*.

■ Initially Freys urge that Rule 58(b)(2), Rules of Civil Procedure, *supra*, requires the jury's verdict to be automatically fully reinstated upon appeal:

> "The remittitur shall not affect the right of the opposite party to appeal from the judgment, and for that purpose the amount of the original judgment shall be considered the amount in controversy."

These rules penalize neither side for seeking review after accepting a remittitur. Obviously a cross appeal is anticipated as a method for a successful plaintiff to seek review of a remittitur. Likewise the granting of a remittitur cannot, in and of itself, destroy any of a defendant's issues on appeal, and for purposes of a subsequent appeal, "the original judgment shall be considered the amount in controversy". Rule 58(b)(2), *supra*. Thus the issue that the whole verdict, even after a remittitur, was the result of bias, passion or prejudice is preserved.

The cross-appeal is here on the merits. Rule 59(i), *supra*. As set forth in Note 2, *supra*, we will also discuss at this juncture Sequoia's allegations that the total verdict was the result of bias and prejudice.

■ Initially we agree with the trial court "that the verdict, in terms of dollars, was not the product of passion or prejudice". The evidence was overwhelming and almost uncontradicted regarding the impact this tragedy would have on Michael and Debra for the rest of their lives. Actual and future out-of-pocket special damages in the area of 1.5 million dollars are supported by the evidence. The agony of a young, newly-married couple, faced with the husband's almost total paralysis from the neck down for the rest of his life, is almost incalculable.

■ Having come to that conclusion, Freys urge that we must reverse because of the Supreme Court's decision in *Creamer v. Troiano*, 108 Ariz. 573, 503 P.2d 794 (1972). We think the opposite is true. That decision stands for the simple proposition that each case involving an additur or remittitur must stand or fall on its own peculiar set of facts:

> "Behind all of these tests still stands the original doctrine—that if the verdict is supported by adequate evidence, it will not be disturbed, and the *greatest possible discretion* is in the hands of the trial judge. In this court, *the ultimate test will always be justice*, and any case before us which shows an unjust result because of the granting or denial of either additur or remittitur, will be reversed."
> 108 Ariz. at 576, 577, 503 P.2d at 797, 798. (Emphasis added).

Reviewing the trial court's actions in this light, we find no abuse of the trial court's sound discretion, *Crystal Coca-Cola Bottling Co. v. Cathey*, 83 Ariz. 163, 317 P.2d 1094 (1957), and we do not find the result unjust in any manner. *Creamer v. Troiano, supra*.

### CONCLUSION

The judgments of the trial court in this cause are, in all respects, affirmed.

HAIRE and DONOFRIO, JJ., concur.